UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


JEREMY ALLEN MAYFIELD and,      )   DOCKET NO. 3:09-CV-220
MAYFIELD MOTORSPORTS, INC;      )
                                )
                                )
     vs.                        )
                                )
NATIONAL ASSOCIATION FOR STOCK  )
CAR AUTO RACING, INC, et al.    )
_____ )


TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE GRAHAM MULLEN
UNITED STATES SENIOR DISTRICT COURT JUDGE
JULY 1, 2009

<u>APPEARANCES</u>:

On Behalf of the Plaintiff:

     WILLIAM K. DIEHL, JR.
     John R. Buric
     James, McElroy & Diehl
     600 S. College, Suite 3000
     Charlotte, North Carolina 28202

On Behalf of the Defendant:

     HELEN M. MAHER
     Olav Antonie Haazen
     Boies, Schiller & Flexner, LLP
     333 Main Street
     Armonk, NY 10504

     THOMAS PAUL HENDRICK
     Hendrick, Bryant & Nerhood, LLP
     723 Coliseum Drive, Suite 101
     Winston Salem, North Carolina
     27106

                  LAURA ANDERSEN, RMR
                  Official Court Reporter
                United States District Court
                 Charlotte, North Carolina

1                    P R O C E E D I N G S

2          THE COURT:  Good morning, counsel.  I will go over

3    a little bit on scheduling.

4          As the Charlotte contingent understands, the

5    funeral for Judge Cliff Johnson is at noon.  I will be

6    leaving, driving our Chief Judge to that funeral at 11:15.

7    If we are not through, which I anticipate to be the case, we

8    will resume at 2:00, pending arrival back from the funeral.

9          Will you be arguing, Mr. Diehl?

10         MR. DIEHL:  I will.

11         THE COURT:  Who will be arguing for the defense?

12         MS. MAHER:  I will be doing part of it and

13   Mr. Hendrick will also be doing part.

14         THE COURT:  How long do you folks anticipate

15   taking?

16         MR. HENDRICK:  We think, Your Honor, probably an

17   hour and 15 minutes.

18         THE COURT:  Mr. Diehl.

19         MR. DIEHL:  I'd like to do it in 30 minutes and be

20   done by 11:00 and go to the funeral.  I'm going, too.

21         Seems to me you have so much paper already --

22         THE COURT:  You don't need an hour and 15 minutes,

23   you can't have an hour and 15 minutes.

24         How ever long Mr. Diehl takes, you can have.  And

25   then Mr. Diehl may have a very short rebuttal thereafter.

Case 3:09-cv-00220-GCM   Document 30   Filed 07/02/09   Page 2 of 67

1  Because there is a ton of paper as has been pointed out.

2          All right, Mr. Diehl.

3          MR. DIEHL:  Judge, we are here to ask Your Honor

4  to lift a suspension of Jeremy Mayfield, which prevents him

5  from driving a stock car in the NASCAR Sprint Cup Series.

6          We're asking you to do that because the suspension

7  which creates all the harm, irreparable and otherwise, is

8  directly caused by a reported drug test result done in a

9  manner that is patently unfair, and eliminates according to

10 the interpretation of NASCAR any opportunity for

11 Mr. Mayfield to show anybody that he is not a recreational

12 drug user.

13         Mr. Mayfield has been driving in NASCAR 17 years.

14 He's had some successes.  This year he started his own team.

15 He was the driver.

16         So those are the two plaintiffs, Mr. Mayfield who

17 is here.  Stand up, Jeremy.

18         And his team, which he and his wife, who's also

19 here, own.

20         It is not Hendrick Motorsports.  It is not Jack

21 Rousch Racing.  It is not Richard Childress.  It's a low

22 budget, try to get started, be successful, single car race

23 team.

24         The driver has absolutely no history of drug

25 abuse, as he says in his affidavit, I've never taken

1   methamphetamine.

2           NASCAR's president has called him in a public

3   announcement, a recreational drug user.  They filed a

4   counterclaim that says he's been using methamphetamine --

5   lest we be concerned about the word that is now widely

6   discussed in the media -- they allege he's been using it all

7   season.  Despite the fact that he took a drug test at the

8   beginning of the season, and had no indication of any drug

9   in his body; that was just January.

10          The suggestion that the quantities of the

11  methamphetamine in his urine sample are so large, would

12  require that this man be a habitual user, that he consumes

13  enormous amounts of the drug.  You'll see the 48,000 -- the

14  technical terms defy me -- nanograms -- John reminds me.

15          Basically indicate, if you learn anything about

16  methamphetamine, he's either a walking zombie or he's dead

17  if he has that much methamphetamine in his body in early May

18  when this test was conducted.

19          He says, I've never touched the stuff.

20          Nobody offers any opinion that he ever exhibited

21  any physical characteristics of methamphetamine, including

22  the five people that worked with him whose affidavits are

23  before you, and who were in Richmond at the race.

24          And more importantly, neither of the two

25  affidavits submitted by NASCAR, from the collector of the

1  sample, and the fella that was also there, Mr. Carter,

2  opined, mentioned, that Mr. Mayfield's teeth were rotting

3  out, that his eyes were sunken, that he was displaying any

4  physical characteristics of what has been commonly seen by

5  almost everybody involving people who use -- who see or know

6  people involving methamphetamine.

7        One of the affidavits from one of Mr. Mayfield's

8  crew persons, was a nine year police officer from

9  Winston-Salem.

10        There's nothing said by anybody of anything at an

11  earlier time at the beginning of the season, the races that

12  he participated in, that demonstrates he exhibited any

13  conduct that shows signs that he must be on something.

14        They mention in their responsive papers that he's

15  had three wrecks.

16        If that were the criteria to demonstrate drug use,

17  there wouldn't be any NASCAR drivers.  Indeed, the wrecks,

18  as we all know, are what brings people to the speedway.

19        Now they don't want anybody to get hurt.  And it's

20  almost a duh statement when they say they don't want drivers

21  using illegal drugs on a racetrack.  Well, like who does.

22  Who wants drivers on Interstate 85 using drugs, or in Myers

23  Park or any other place.

24        This isn't a legitimate argument, that if

25  Mr. Mayfield is permitted to drive, that it will endanger

1    NASCAR drivers, it will endanger the public.  Nobody will

2    want to race against him.

3              As the result of their decreeing -- which is what

4    they have done -- that he used drugs.  And we're not going

5    to let you race, and you don't get to challenge the test.

6              He has been arrested, if you will, just before the

7    race at Darlington.  He has been tried, when they told him

8    and sent him a letter telling him that he was suspended.

9    And he's been convicted.

10             He has been told in no uncertain terms, you have

11   one choice, Mr. Mayfield, you comply with our letter, you

12   get down on your knee, you do a number of mea culpas, maybe

13   three Acts of Contrition, four Lord's Prayer, the Apostle's

14   Creed, and then we may consider that you come back.  You

15   don't have a choice about saying, hey, maybe your test was

16   wrong.

17             Is it possible that the preeminent Dr. Black and

18   the Aegis lab made a mistake in conjunction with what they

19   did.

20             We asked him, and it's in Mr. Mayfield's

21   affidavit.  They do like 3,000 of these tests a day, on 800

22   and some samples.  Is it possible something got mixed up.

23             Did they comply with any reasonable protocol when

24   they collected the sample in a trailer, in a cluttered

25   bathroom, with cups just sitting there.  Is it possible that

1  a cup got mixed up.

2          Well the answer is, of course, all those things

3  are possible.  And the question is, is Mr. Mayfield given an

4  opportunity to challenge that.

5          Which leads us to the crux of the case.  NASCAR

6  adopted substance abuse policy.  You have a copy of it.  It

7  went into effect in January.  You can read it from head to

8  toe, and you will not find any particular subject about what

9  is going to be violative of the policy.

10          It says, substances that in NASCAR's determination

11  may effect adversely the safety and well-being of the

12  competitors.

13          THE COURT:  Didn't they send out a memo listing a

14  whole bunch of stuff?

15          MR. DIEHL:  That they said they test for.  And

16  they said, that memo, on December the 8th, you have it, we

17  have it, itemizes things that they test for.  For example,

18  codeine and pseudoephedrine.  Those are not banned.  And

19  they're not banned by the December the 8th memo.  But they

20  say they are going to test for those among others, including

21  methamphetamine and cocaine.

22          But they don't have an identifiable list in the

23  policy of what is banned.  If they decide to ban Coca-cola

24  or coffee or orange juice or anything else, their argument

25  is, we can.  We have the absolute discretion to decide

1  what's banned by the policy.

2          In addition, the policy says, the samples will be

3  tested at a SAMHSA lab.  All testing will be done at a

4  facility or facilities exclusively selected by NASCAR.  From

5  among those facilities that have been certified by the

6  Substance Abuse and Mental Health Services Administration of

7  the United States Department of Health and Human Services,

8  and/or by the College of American Pathologist Forensic Urine

9  Drug Testing Program.

10         That's all it says.

11         And to be a SAMHSA lab, you have to follow certain

12  procedures.  Yes, the procedures say, they're applicable for

13  federal drug testing.  And the question is, so what.

14         If you are referring testing to a SAMHSA lab, the

15  reasonable expectation of NASCAR -- whether they now say, oh

16  no, they don't have to follow SAMHSA testing procedures.

17  But the reasonable expectation is, they will follow those

18  procedures.

19         And this isn't testing federal employee stock car

20  drivers.  It's testing individuals, whether they're drivers

21  or crew chiefs or crew members, from the public.

22         But it is disingenuous, Your Honor, to argue that

23  we don't have to adhere to any procedures that are set out

24  by SAMHSA, even though it has to be done by a SAMHSA lab.

25         In the brief and in their papers to support this,

1  they suggest that they test pursuant to the World

2  Anti-Doping Agency, WADA.  And we have those rules and

3  regulations.  They're never mentioned in the substance abuse

4  policy.  And if you read them, they provide nothing to help

5  NASCAR.  Because their procedures, contrary to what

6  Dr. Black says, splits samples, and permit a test of the "B"

7  sample.

8          And that's what the -- that's the crux of the

9  issue here.  That they get Mr. Mayfield's urine sample.

10  It's split into "A" and "B".  It gets to Aegis.  "A" is

11  tested.  Turns out positive.  Jeremy is notified.

12          Then he gets a contact from this fella Aukerman,

13  who is a medical review officer, which is a procedure within

14  the SAMHSA regulations and procedures.

15          Why do they use an MRO, if they're not following

16  SAMHSA regulations?

17          In fact, they are suppose to follow those, and

18  that's why they use the MRO, who is suppose to tell

19  Mr. Mayfield, you didn't do so good on the "A" sample.  We

20  have a "B" sample.  You have 72 hours to tell me, Dr.

21  Aukerman, where to send it to an independent lab, where it

22  will go in a sealed capsule, just like we got it.  The seal

23  will not have been broken.  And the second lab, independent

24  of Aegis, also a SAMHSA lab, will test it.  And we'll get

25  yet another view of the process, and whether or not this is

Case 3:09-cv-00220-GCM   Document 30   Filed 07/02/09   Page 9 of 67

1  a legitimate result, or how it might have been determined

2  that it was positive, when the "A" sample was tested by

3  Aegis.

4         But that policy, Your Honor, builds into the

5  process, at least an opportunity for Mr. Mayfield to have

6  reexamined, before he's suspended, banned from NASCAR, the

7  "B" sample in its pristeen, no broken seal state.  Is that

8  important?  You bet.

9         The SAMHSA regulations say, and we've quoted them.

10  That under their rules and regulations if they get a broken

11  sealed sample, the testing is stopped.  They will not test,

12  under their regulations, a broken sealed sample.  That's

13  Section 2.4 of the rules and regulations of the SAMHSA

14  testing.

15         Upon -- if they find that a specimen bottle label

16  seal is broken, or shows evidence of tampering, but broken,

17  the specimen cannot be tested.  It's treated just like A.

18  And if you get to an A bottle and its seal is broken, the

19  test stops.

20         So they would not test a broken seal, properly.

21  Because nobody really knows what has happened.  And

22  everybody knows, that if the seal is properly -- has been

23  properly maintained, at least it gives an opportunity to

24  look at the contents of the specimen and provide an

25  independent result.

1          Now, what happened here -- any question that Aegis

2    tested B and broke the seal.

3          Mr. Mayfield says, I didn't tell them to do

4    anything.  You know, I'm shocked Mister -- the MRO is

5    telling me you got this.  We have a B.  And Jeremy says,

6    what's going to be the difference between A and B.  If A

7    tested -- what -- I don't understand.

8          And the MRO, apparently takes that as his

9    authority to have the "B" sample tested, but not by an

10   independent lab.  And he never advises Jeremy of his right

11   to have an independent test.  That's not controverted.

12         Even though Aukerman's affidavit relates a

13   conversation that's different than Jeremy relates the

14   conversation, it's almost immaterial.

15         Any question that he authorized Aegis to do the

16   test, and they did it within two days of the first test.

17   Thereby eliminating the 72 hours, and the possibility to get

18   it to an independent lab.

19         And they say that's perfectly okay, because we,

20   NASCAR, are not bound by the lab that SAMHSA operating under

21   SAMHSA procedures.

22         We have affidavits before you that say that's not

23   good lab practice.  Nobody disputes what the regulations

24   say, that the procedures are applicable to testing of

25   federal employees.  That begs the issue.

1          The issue is, when you designate it as a SAMHSA

2    lab, then, can you make up the procedure that the lab

3    follows, because you're not testing federal employees?  Of

4    course not.

5          I mean, arguably, Your Honor, and I'm thinking

6    about this last night, the samples could have gotten to

7    Dr. Black, and because there is no procedure, not in the

8    NASCAR policy.

9          And now according to Black, he's not bound by the

10   agency that his lab is a member of, and he's required to be

11   a member of, and he's required to do all these procedures to

12   keep his license related to federal employees.

13         He gets these materials and says, well I don't

14   have any rules.  I'm gonna follow the taste test.  Give me a

15   cup of Mr. Mayfield's urine, I'll take a hit, and I'll

16   decide, yeah, that's methamphetamine, report it back

17   positive.

18         Taken to its logical extension, that's exactly

19   what these people are arguing.  We're not bound by anything.

20   We're not bound by good lab practices.  We're not bound by

21   anything.  We're NASCAR.  We can do what we want to do.  We

22   can decide after the fact what's banned and what you should

23   be suspended for.

24         I read one article, in trying to get up to speed

25   on this stuff by a commentator who's a lawyer, on their

1  theory, they could ban chocolate milk.  Or as I said, and
2  not in advance, coffee, Coca-cola, orange juice.  And decide
3  after the fact, not tell the employee, or the party to the
4  contract, that they have decided this is going to be a
5  grounds to eliminate your right to run your race car.

6        Now, they want to equate NASCAR to the NFL, the
7  hockey league, NHL, Major League Baseball.  All those groups
8  have collective bargaining agreements.  They've had their
9  members and their representatives agree on a procedure.

10        So what they do, and whether they use SAMHSA labs
11  and a quarter, are worth 25 cents.  Their workers, members,
12  have agreed in advance on a procedure.

13        The race car drivers haven't agreed on a procedure
14  they don't even know about.  They've agreed that there's a
15  substance abuse policy, and they will be bound by it, but
16  they expect that there's a reasonable substance abuse
17  policy.  There's something that gives them some protection
18  when they're accused, possibly erroneously, of taking a
19  drug.

20        The issues that you've got to decide are not novel
21  here.  We've all been dealing with *Blackwelder* for a long,
22  long time.

23        And so we understand that we've got to show
24  likelihood of irreparable harm to Mayfield, if you don't
25  give us an injunction.  The likelihood of harm to NASCAR if

Case 3:09-cv-00220-GCM   Document 30   Filed 07/02/09   Page 13 of 67

1    you give us an injunction.  The likelihood that Mayfield

2    will succeed on the merits, and the public interest.

3              And if we make a strong showing of irreparable

4    harm, the Court then balances the likelihood of the harm to

5    Mayfield, against the likelihood of harm to NASCAR.

6              If that balance weighs in our favor, then

7    typically you go on to the next -- as we read the cases --

8    the next criteria, which is, are we likely to succeed on the

9    merits.

10             They think there's no irreparable harm, because we

11   can get monetary damages.  But that flies in the face of

12   reality.  They point out that, you know, he's got this

13   record.  And he's done this.

14             But at the same time they tell you that, he

15   doesn't know whether he's even going to make a race.

16             All the races are -- they have qualifications.

17   Unless like this past weekend in New Hampshire, it rained

18   out.  So they just got set by where you are in the

19   standings.

20             So you don't know whether he's going to make a

21   race.  Indeed, he hasn't made a couple races this year.

22   Moreover, if he makes the race, you don't know if he

23   finishes.  And if he finishes, you don't know where he's

24   gonna finish.

25             And if he has sponsors and he's not racing, the

1 sponsors will not pay him to put their name on his car when

2 it doesn't drive around the track and it's shown worldwide,

3 pursuant to either TNT, what it's on right now, or ESPN, or

4 whatever the television outlet is. Not to mention the

5 people at the various racetracks who get to see it.

6 He loses his people, who are his employees. He

7 loses the opportunity to make any money, if you take away

8 his privilege of racing, which is what they've done.

9 And the case law makes clear that this kind of

10 loss is the kind of loss that's irreparable. We site you

11 *Multi-Channel*, it's a Fourth Circuit case. *Merrill Lynch*,

12 is another Fourth Circuit case.

13 The *National Football League* case where they got

14 an injunction against the players association, against the

15 NFL. Because they were banning people based on a substance

16 that nobody knew was a prohibitive substance.

17 These kinds of losses are not directly compensable

18 in monetary damages, and they qualify as the irreparable

19 harm that can be prevented with issues of an injunction.

20 Here, Your Honor, if Mr. Mayfield is telling the

21 truth, on his way to Richmond, he took a Claritin D which he

22 can buy at a drugstore. It has pseudoephedrine -- which

23 anybody that's been awake for the last 25 years knows is an

24 ingredient of methamphetamine -- and they put it behind the

25 counter at your Rite-Aid. So you just can't go take it off

1   the shelf, they take your name.

2         So he took a Claritin D, it's a sponsor of Carl

3   Edwards' car.  It rides around on Sundays or Saturdays, with

4   his sign all over the side of the car advertising it.

5         Who in the world could conceive that if you're

6   dealing with a stuffy nose and you take a Claritin D, and

7   you take another one, six hours later, you're violating a

8   drug policy.

9         Who could conceive that if you have ADHD and you

10   are prescribed Adderall, as literally millions of people

11   are, and you take it in accordance with what you're told to

12   take it with your prescription, that you're violating a

13   NASCAR drug policy.

14         If Jeff Gordon takes Allegra, which is all over

15   the internet, is he violating the drug policy.  I mean, is

16   Allegra banned?  Is aspirin banned?  Can they decide after

17   the fact that these things are banned, and thereby banish

18   the driver to the sidelines until he can get through a

19   lawsuit.  I say to Your Honor, that's patently unfair.  And

20   it shows that Mr. Mayfield has irreparable harm.

21         It's also true that there's no harm to NASCAR,

22   despite the parade of horribles that's in the brief.

23   Drivers will stop racing if Jeremy's out there.  It should

24   increase his winnings, if he's the only car.  But that's

25   what they say.

1    They announce that they won't be able to properly
2  do their drug policy, if he's told that you can go back
3  racing because you didn't do this one right.

4    He volunteered to be subject to their policy.
5  Yeah, he did.  And he thought, as every driver thinks, that
6  the policy comes with it, the responsibility of good faith,
7  fair dealing, in administering the substance abuse policy.

8    So even if they don't have prohibited drugs, and
9  they don't have a specified procedure, the driver can rely
10  on the fact that it's a SAMHSA lab, and these guys are not
11  quacks, and they're not doing the taste test.  They're out
12  there going through all the hoops, jump through all the
13  hoops, go through all the procedures that make it a proper
14  test.  Then we're going to leave something aside so that
15  somebody can provide backup information.  That's what they
16  reasonably rely on.

17    So there's no harm to NASCAR if Jeremy gets to
18  race this Saturday night in Daytona, which is what we are
19  asking you to permit him to do.

20    And there's absolutely nothing that indicates,
21  really, that they can be harmed going forward with Jeremy,
22  because they can drug test him every day, every day, under
23  their policy, under their rules.  Only thing they can't do,
24  is do it unfairly.

25    They can test him.  They can follow the collection

1 procedures.  They can follow -- keeping the vial secure.

2 Send it to a confident lab.  They can test it.  They can get

3 a result.  If there is a positive result, they can send it

4 to another lab for confirmatory testing, same SAMHSA lab,

5 that lab can test the vial, because the seal has not been

6 broken.  And the policy goes on.  So there is no harm to

7 defendant.

8    And if you're weighing the balance of this

9 irreparable harm, it is overwhelming in favor of Jeremy

10 Mayfield and his company.

11    It is not anywhere even close, I respectfully

12 suggest, that somehow they've got an even balance, or that

13 in some sliding scale consideration, you get down to

14 thinking, gee, they're going to be harmed if I enter an

15 injunction.

16    I suggest to the Court that there is a substantial

17 likelihood that we win this case.  So success on the merits,

18 which is the next issue when you're considering an

19 injunction, favors Mr. Mayfield.

20    There isn't any question about what they didn't do

21 in accordance with the SAMHSA procedures.  They just blew

22 that.  There isn't any question that they could have made a

23 mistake.

24    There isn't any question that they didn't secure

25 the "B" sample and let it go to someplace else.  And that's

1    the critical issue on the part of do we prevail on the

2    merits.  There's really not much debate about it.  Not much

3    for a jury to decide.

4         How in the world -- I keep asking this -- can they

5    have a SAMHSA lab, it's got to be SAMHSA.  And to be SAMHSA,

6    SAMHSA's got to comply with these very elaborate policies

7    established by the federal government.

8         And they say, well it's not federal government

9    testing, therefore they can use the taste test, which is the

10   bottom line of their argument.  We can do anything we want.

11        That can't be.  They can't likely prove that, and

12   be entitled somehow to defeat the claim on that theory.

13        So we say, Your Honor, that there's a substantial

14   likelihood of our success on the merits.  There's almost

15   none for NASCAR.

16        Can they intentionally or negligently not follow

17   the guidelines with impunity.  Our evidence before you

18   includes that the A/B, breakout, and the independent test of

19   the "B" sample is good lab policy.  There's nothing

20   different in WADA.

21        In North Carolina, Your Honor, and we cite you to

22   the 9230, which is drug testing requirements in this state,

23   you have to do the same thing; you have to test the B by an

24   independent lab.

25        So can they ignore their own regulations?  Can

1  they negligently not comply with their regulations?  We say,

2  no.  They must be held accountable.

3          And if you don't follow required procedures, then

4  drug tests are thrown out.  And we cite you to three

5  specific cases that are in the brief on that holding.

6          And we also direct you to this *Reynolds* case which

7  involved the racer -- the runner, who was banned.  Then the

8  response was similar to NASCAR's.  Well, if you let him run,

9  Judge, we're going to ban the other runners from racing

10 against him.  And the court said you can't do that.

11          So this particular process that they followed,

12 indicates it's wrong.  And it ought to be stopped at the

13 trial, also.  But it needs to stop now, so that Mr. Mayfield

14 has an opportunity to proceed with his career.

15          All of this is discretionary, says NASCAR.  We can

16 ban you because you got a crew cut.  Or maybe they don't

17 like long hair.  We can ban you for any reason.  It's all

18 our discretion about whether you drive this race.

19          But the law is abundantly clear in every

20 jurisdiction, whether it's North Carolina or Florida or

21 anywhere else, that when you have discretionary power in a

22 situation such as this, you can't abuse your discretion.

23 You can't exercise your discretion in an arbitrary and

24 capricious manner to the detriment of the person that's

25 getting the result of this discretion.

1        And we cite North Carolina law, the *Reynolds* case

2 as I just mentioned to you, which clearly stands for that

3 proposition.

4        Public policy, I really dealt with at the

5 beginning of this. They can't just make up a procedure.

6 And the public policy of this state, is that you give

7 someone charged with something, a chance to demonstrate you

8 made a mistake.

9        If this policy is left the way it is, there is no

10 remedy for Mr. Mayfield, absent a very expensive trial,

11 against a defendant that has limitless amounts of money,

12 apparently.

13        And he really doesn't have an opportunity to ever

14 get his Sample "B" tested by a SAMHSA lab in a pristeen

15 condition.

16        Now, they sent the A and B samples that have been

17 in the care of Dr. Black and his company, to yet another lab

18 last week. And they filed an affidavit that said, we got

19 the same thing you got.

20        But actually if they read their own -- and it's a

21 SAMHSA lab. If they read their own rules, they wouldn't

22 have tested either one of them, because the seal's been

23 broken.

24        So there's no way here, absent your intervention,

25 for us to actually ever test a pristeen "B" sample.

1          So public policy cuts in favor of Mr. Mayfield

2   being given his day.  And today is his day.

3          THE COURT:  They argue that this would be a

4   mandatory injunction.  What do you say about that?

5          MR. DIEHL:  Pardon?

6          THE COURT:  They argue that this would be a

7   mandatory injunction, which is disfavored.  What do you say

8   about that?

9          MR. DIEHL:  I'm not arguing with what the law

10  says.  But I think these facts justify your intervention,

11  because they're overwhelming.

12          You can issue a mandatory injunction, I mean,

13  there isn't a ban on them.  You can say to NASCAR, I'm

14  ordering his suspension rescinded.  I'm granting that

15  injunctive relief.  He is back where he was before the first

16  of May; period.  We're not worried now about what it was,

17  keeping that secret, because it's been out for a long time.

18          But an injunction, returning him to the place he

19  was before they suspended him, is clearly within your power,

20  and is clearly supported on the record in this case.

21          It's July 4th weekend.  Somehow that, that rings

22  true to me, as I talk to you, about asking you to correct a

23  wrong.  Our whole country got founded on people objecting to

24  being told what to do with no chance for their own views to

25  be considered.

1          And independence day for Jeremy ought to be today.
2    He ought to get his privilege to drive back.  He's not a
3    government.  We all know that.  I mean, this isn't a case
4    involving a constitutional situation, but it is a case
5    involving fairness.
6          And I think as I read these cases, that's exactly
7    what you can do.  Even with a private organization like
8    NASCAR.  Because other courts have done it.  It's got to be
9    reasonable.  It's got to be applied reasonably.  You can't
10   make up the process as you go along.  Which is what they're
11   arguing to you.
12         Thank you.
13         THE COURT:  If I understand you correctly, the
14   crux of your argument would be, that because NASCAR requires
15   the testing lab to be SAMHSA certified --
16         MR. DIEHL:  Right.
17         THE COURT:  -- that Mr. Mayfield and any other
18   driver has a reasonable expectation that the SAMHSA lab will
19   perform the procedures they are required to perform in order
20   to remain certified.
21         MR. DIEHL:  Right.  And they won't -- excuse me.
22         THE COURT:  And they didn't do it.
23         MR. DIEHL:  It's clear they didn't do it.
24         And their argument on the other hand is, we don't
25   have to do that.  They say that flat out.  That doesn't mean

Case 3:09-cv-00220-GCM   Document 30   Filed 07/02/09   Page 23 of 67

1    anything, the fact that it's a SAMHSA lab.

2            I mean, they can have a procedure -- although it's

3    not described in their substance abuse policy -- they can

4    have a procedure where you pee in a cup, and you go over and

5    you stick a reagent stick in it, like we did when we were in

6    high school in chemistry.  And if it turns green, it's meth.

7    If it turns blue, it was just coffee.  Then they could

8    decide coffee is banned, because it's a stimulant.

9            And we're gonna say now, after the fact, that if

10    you do coffee or you take, in this case, Claritin-D, then

11    you're violative of our drug policy, and we can take away

12    all the privileges that we have by contract with you,

13    because they're all discretionary anyway.

14            That just smells bad.  And it stinks enough that

15    the court should intervene and say, you can't do that.  I

16    don't care who you are, NASCAR.  You can be concerned for

17    safety.  Good.  We're all concerned for safety.

18            You don't want drivers driving around on drugs.

19    Of course not.

20            But if you're gonna have a drug testing policy,

21    you've got to fairly advise the people that are going to be

22    tested of the process.  Then you got to do it in a fair way,

23    so that they don't lose the things that Mr. Mayfield has

24    lost.  Because we, just in our discretion, can do what we

25    want to do.  We are the king.  We are NASCAR.

1          THE COURT:  All right.  Thank you.

2          We're going to, in view of the time that you have

3   expended, which is about 45 minutes, then in all fairness to

4   the defense, will allow 45 minutes for the defense to go

5   forward.  And then you can have brief rebuttal.

6          So we will resume at 2:00.  I regret having to

7   leave early, but if we don't leave early and get out there,

8   we are not going to get a seat.

9          MR. DIEHL:  Can we leave our stuff in here?

10         THE COURT:  You may absolutely leave your stuff in

11  here.

12         All right.  Then we will be in recess until 2:00.

13  (Recess.)

14         THE COURT:  All right.  Sorry for the brief delay.

15  The funeral took a lot longer than I had anticipated.

16         All right.  For the defense, NASCAR and other

17  defendants.

18         MR. DIEHL:  Your Honor, before she begins --

19         THE COURT:  Sir.

20         MR. DIEHL:  We obtained yet another expert

21  affidavit, which we E-filed during the break.  I have hard

22  copies --

23         THE COURT:  May I see it, please?

24         MR. DIEHL:  Yes, sir.  One for the clerk and one

25  for the opposing counsel.  May I approach?

1          THE COURT:  Yes.  If you would give one to them.

2          MR. DIEHL:  I have done that.

3          THE COURT:  All right.  We can hear from the

4  defense now.

5          MR. HENDRICK:  Your Honor, may I be heard on the

6  affidavit before we start?

7          THE COURT:  Yes.

8          MR. HENDRICK:  We were provided that affidavit

9  about 10 minutes after 2:00.

10          There was an agreement between counsel for the

11  plaintiff and counsel for the defendant to exchange

12  affidavits in advance of this hearing.  And then for the

13  plaintiffs to brief their position and the defendants to do

14  likewise.

15          This affidavit comes, obviously to us, with no

16  opportunity to study it, or no opportunity to discuss it,

17  with Aegis or NASCAR.

18          We do have Dr. Robert in the courtroom.  And I

19  suppose we could respond to it with live testimony.

20          But it is not in accordance, in my understanding,

21  with our agreement, which we confirmed with your law clerk.

22          And I think it's inappropriate to submit an

23  affidavit that at 10 minutes after 2:00, we have absolutely

24  no opportunity to review, study or respond to, when that

25  wasn't the ground rules that were established.

1          MR. DIEHL:  Your Honor, they filed an affidavit,

2     same day on Thursday.  I'm not disagreeing with the

3     representation that we made an agreement about that.  We saw

4     their affidavit.  The issues in Dr. Schueler's report -- and

5     they've attacked our experts, repeatedly.

6          The issue in Dr. Schueler's report is not a new

7     subject; it's proper procedures for drug testing.  And he is

8     familiar with SAMHSA process.

9          I say that the materials are helpful to you in

10    making your decision.  You can exercise your discretion --

11         THE COURT:  I will receive the affidavit.

12         MR. DIEHL:  Thank you.

13         THE COURT:  All right, ma'am, you may proceed.

14         MS. MAHER:  Good afternoon, Your Honor.  My name

15    is Helen Maher.  I represent NASCAR and Brian France in this

16    matter.  My co-counsel will be addressing the facts about

17    the testing, as well as plaintiff's failure to show the

18    success on the merits.

19         Your Honor, this case is not about chocolate milk

20    or orange juice.  This case is about a dangerous and

21    mind-altering drug, methamphetamine.  NASCAR is to race

22    tracks, what law enforcement is to the public.  NASCAR's

23    goal is to keep people safe, not to act as a capricious

24    king.

25         This hearing is about public safety.  It's about

1   the safety of the drivers, teams, and others who participate

2   in NASCAR events.  It's about the safety of the millions of

3   fans that attend NASCAR events each year.

4          Mr. Mayfield's lawyers have spoken quite a bit

5   about the alleged irreparable harm Mr. Mayfield will incur

6   if a preliminary injunction is not issued.

7          But absent from their discussion is the real

8   irreparable harm in this case.  And that is the serious harm

9   that can occur to the 42 other drivers on the track, the

10  hundreds of crew members, and thousands of fans, while a

11  drug user is driving on the track.

12         This is about a driver taking an illegal drug that

13  impairs his motor skills and judgment, and then getting into

14  a 3,500 pound car, and driving 120 miles an hour.

15         NASCAR has a strong interest in keeping its races

16  as safe as possible.  The public has an interest in

17  protecting its citizens from unnecessary harm.

18         If Mr. Mayfield is allowed to race after testing

19  positive for methamphetamine, who will protect the public?

20  Who will protect the drivers?  And who will protect the

21  fans?

22         At the end of the day, the question that this

23  court has to decide is this:

24         Is there a legal basis for putting Mr. Mayfield

25  back on the track to endanger all of the other NASCAR

1    drivers and fans while this litigation is pending.

2              The answer is no.

3              Mr. Mayfield is seeking far more than just to

4    maintain the status quo.  As you'll see in this slide, the

5    driver/owner agreement does not provide Mr. Mayfield with

6    any right whatsoever to participate in NASCAR events.

7              In fact, the contract that Mr. Mayfield signed,

8    says that the eligibility of every driver to participate in

9    NASCAR events, is subject to NASCAR's discretion.

10             Based on the contracts that Mr. Mayfield signed,

11   NASCAR does not need to have a reason to exclude him.  But

12   here, NASCAR has a very good reason.  He tested positive for

13   an illegal drug, and endangered the lives of everyone around

14   him.  NASCAR had no choice but to suspend him.  His

15   suspension was proper and it was substantiated by all of the

16   tests.

17             Plaintiffs basically want this Court to act as a

18   NASCAR appeal board.  If the Court reverses the suspension,

19   the sport and NASCAR will suffer serious harm.

20             As my co-counsel will discuss, Mr. Mayfield has

21   failed to demonstrate that the plaintiffs are likely to

22   succeed on the merits of the claims.

23             Mr. Diehl told a very entertaining story today.  I

24   was even entertained by it.  But when you come into federal

25   court, you need facts and law, and he has neither.  Here are

1   some of the facts that he missed.

2           NASCAR does everything it can to keep their races

3   safe.  They've installed safer barriers, which are steel and

4   foam walls, so that if cars hit them the impact is lessened.

5   They've required drivers to wear head and neck restraints.

6   They've had teams install roof flaps so that the cars cannot

7   become airborne and go into the stands.  And they've

8   implemented head gear and speed limits for the pit area.

9           NASCAR has had a drug testing policy in place for

10  20 years.  It wasn't some willy-nilly policy.  NASCAR had

11  spoken to other sport leagues, they spoke to experts, and

12  hired a world-renowned testing lab.

13          NASCAR has a testing policy for two reasons:

14          First, to protect the public from harm if someone

15  were to ingest drugs and get on the track.

16          Two, to prevent anyone from having a competitive

17  edge.

18          In 2008, NASCAR revised its substance abuse policy

19  to include random drug testing.  It's important to note that

20  the drivers have encouraged NASCAR to do more testing and to

21  do random testing, as well.

22          As Your Honor pointed out this morning, along with

23  its substance abuse policy, NASCAR issued a non-exhaustive

24  list of prohibited substances, and chocolate milk is not on

25  this list, but methamphetamine actually is.

1    THE COURT:  But what I think you denigrate his

2 point, and have failed to do so successfully.  His point is,

3 and you may reply to this.

4    What is to preclude NASCAR from ex post facto

5 determining to ban anything?

6    MS. MAHER:  Well, I think given the fact the sport

7 is very dangerous.  So they don't really know what types of

8 drugs are actually going to make somebody not be able to

9 drive safely, so they can't come up with a conclusive list.

10 It has to be fluid.  It has to be able to --

11    THE COURT:  That's not quite responsive.

12    I can understand that the panoply of pharmacopeia

13 can change, and that a drug may come new on the scene.

14    His point was, that there is nothing to preclude

15 NASCAR from, ex post facto banning something, before anybody

16 know's its dangerous.  What do you say to that?

17    MS. MAHER:  I think that as soon as NASCAR

18 realizes something is dangerous, they alert the drivers.

19 But ex post facto, I mean, at the end of the day, the goal

20 is to make sure everybody is safe.

21    The issue here is, methamphetamine has always been

22 banned, it's not something new.  And that argument is a red

23 herring that something could be banned ex post facto.

24 Methamphetamine has always been on the list.

25    THE COURT:  Okay.

1        MS. MAHER:  The first person to violate NASCAR's

2    substance abuse policy was a member of Mr. Mayfield's team.

3    At the time, Mr. Mayfield issued a press statement saying

4    that he appreciated NASCAR's policy.  Yet now he contends he

5    doesn't know what it is, and he doesn't know what was

6    banned.

7        Mr. Mayfield was selected to be randomly tested,

8    and he provided a urine sample to a collector, who happens

9    to be a former FBI special agent.  Those tests came back

10   positive for methamphetamine and amphetamine.

11       Mr. Mayfield exercised his due process rights at

12   that time, and asked that the Sample "B" be tested.  After

13   the test, Mr. Mayfield signed the lab's custody and control

14   form.

15       The form indicates that he provided a urine

16   sample.  He did not adulterate it.  And that each specimen

17   bottle was sealed with a tamper-evident seal in his

18   presence.  And that's the document that's on display right

19   now, Your Honor.

20       The gist of the story is, that after he failed the

21   drug test, Mr. Mayfield tried to explain it away by saying

22   that it was due to his ingestion of Adderall and Claritin-D.

23       Dr. Black indicated to Mr. Mayfield at that time,

24   it was not possible that the Adderall and Claritin could do

25   that, given the sophisticated test that he uses.

Case 3:09-cv-00220-GCM   Document 30   Filed 07/02/09   Page 32 of 67

1          Mr. Mayfield has not told the Court that his

2   diagnosis of ADHD, which he was prescribed the Adderall, was

3   actually by a physician's assistant, not his regular

4   physician.  In fact, not a physician at all.

5          This is a spa that claims on its web site, its

6   services include laser hair removal, Botox injections,

7   facials and acne treatment.  It does not identify that its

8   services include diagnosis of neuro-behavioral disorders,

9   such as ADHD.

10         Each year Mr. Mayfield signs a medical form that

11  states, I also certify that should there be any change in my

12  health status during the racing season, that I will inform

13  the medical liaison coordinator's office.

14         Contrary to Mr. Mayfield's assertions, NASCAR's

15  not concerned with Mr. Mayfield's use of Claritin-D.

16         Mr. Mayfield followed proper procedure with

17  respect to Claritin-D.  In June of 2004 he told NASCAR he

18  was taking Claritin-D.  But for some reason he hid the fact

19  that he was taking Adderall.

20         It's important to note that NASCAR requires

21  disclosure of any drugs by the drivers, so they can meet

22  with the NASCAR doctors to talk about whether the levels are

23  safe and whether they can drive with them.  Adderall by

24  itself, and in certain amounts, is not necessarily a banned

25  substance.

1       Since filing this case, Mr. Mayfield has been

2  complaining that all he wanted was an independent lab to do

3  the test.  And NASCAR offered that to him last week.  Did

4  Mr. Mayfield take up NASCAR's offer to have the sample

5  tested again?  No.  He said he didn't want to.

6       Well NASCAR's attorneys had it tested anyway, and

7  it tested positive for methamphetamine.  And it came back

8  virtually identical to levels of methamphetamine that the

9  lab found.

10      This, again, shows that the results are not the

11 product of Adderall and Claritin.  Because that lab only

12 tested for methamphetamine.

13      The bottom line now, is that four tests have been

14 conducted.  And all four tests show that Mr. Mayfield

15 ingested methamphetamine and tested positive for it.

16      Mr. Mayfield does not want NASCAR's help.  He

17 doesn't want to change his behavior.  He wants this Court to

18 order NASCAR to let him race.  And he doesn't care who he

19 has to hurt in the process.

20      But it is NASCAR's responsibility to care who he

21 hurts.  And while this litigation is pending, NASCAR has a

22 duty to prevent him from injuring anyone at a NASCAR event.

23      Plaintiffs have failed to meet their burden in

24 establishing that a preliminary injunction is warranted in

25 this matter.

1         As Your Honor is aware, preliminary injunctions

2  are extraordinary remedies, to be issued only in limited

3  circumstances.  We don't believe that this is one of those

4  circumstances.

5         As an initial matter, Mayfield Motorsports is not

6  entitled to injunctive relief.  MMI has been continued to

7  race.  It has not been suspended, but has chosen not to

8  race.  Therefore, its injury has not been caused at the

9  hands of NASCAR.  It's been self-inflicted.  And case law

10  shows that if you have a self-inflicted injury, it does not

11  constitute irreparable harm.

12         In this case, MMI can and did use another driver.

13  After Mr. Mayfield was suspended, they used J.J. Yeley.  And

14  it wasn't that they had to use a second rate driver, they

15  actually used the driver that statistically has fared better

16  than Mr. Mayfield.

17         Mr. Mayfield has failed to show irreparable harm.

18  First, his argument is based on harm to reputation and

19  publication of the drug results.

20         Mr. Mayfield's test results have been published in

21  national media.  He himself disclosed the drug to the sport

22  in papers which can be accessed by anyone with an internet

23  connection and a computer.

24         The claimed loss of advertisements and

25  sponsorships, do not constitute irreparable harm.  They all

1  happened, if they happened at all, in the past.

2          The irreparable injury, injury must concentrate on

3  current threats, not past ones.  Here, no injunction can

4  remedy the alleged harm to Mr. Mayfield's reputation,

5  because he alleged that it occurred on May 15th, 2009, as a

6  result of NASCAR announcing his suspension.

7          And even if Mr. Mayfield did suffer any

8  reputational harm, there is no risk of further harm, because

9  Mr. Mayfield's suspension, and the general facts of it are

10  widely known.

11          There is no irreparable harm, because the

12  driver/owner agreement may be terminated in NASCAR's

13  discretion.  That was the first slide that you saw this

14  afternoon.

15          THE COURT:  Is there any, any limitation on that

16  discretion?

17          MS. MAHER:  I think that NASCAR has always

18  exercised that discretion in a reasonable manner as a

19  business.

20          THE COURT:  Again, that's not responsive.

21          If your answer is there is none; step up and own

22  it.

23          MS. MAHER:  I think that the.

24          THE COURT:  I mean, if that's your answer, step up

25  and own it.

1        MS. MAHER:  Okay.  The fact of the matter is, that

2    it is always subject to NASCAR's sole discretion.

3        THE COURT:  All right.  Thank you.

4        MS. MAHER:  As I discussed earlier, Mr. Mayfield

5    is asking this Court to give him a right that he doesn't

6    have.  NASCAR has the right to terminate Mr. Mayfield or any

7    other driver in NASCAR's sole discretion.  In part, because

8    the owner/driver agreement is essentially a contract at

9    will.  It's terminable at will by either party.

10       Mr. Mayfield has also demonstrated that he does

11   not have to perform under it either.  So it's not just

12   NASCAR who can decide not to perform under it.  It's also

13   Mr. Mayfield who has chosen to do that in certain

14   circumstances.

15       Plaintiff cite the *Reynolds* case, and that's

16   distinguishable for several reasons.  In that case the

17   athlete actually lost his sponsorships.  Here, MMI did not.

18       And you will see at Exhibit Five to our brief,

19   that SMALLSPONSOR.COM, which claims to be his primary

20   sponsor, states on its web site that it will stick with MMI,

21   notwithstanding Mr. Mayfield's suspension.

22       In the *Reynolds* court, it was easy to grant an

23   injunction, because there was no danger of injury to other,

24   he was a runner, sprinter.  Here, you have somebody on

25   drugs, getting into a 3500 pound car next to 42 other

1    people, in front of and near -- near thousands of fans.

2            In *Reynolds* there were problems with the testing.

3    In fact, they found through experts that it wasn't even the

4    runner's sample.  The two samples did not match at all.

5            Here, the best that Mr. Diehl can do is say,

6    there's a possibility something happened.  But he has no

7    evidence of anything.  He doesn't suggest that anything was

8    wrong.  He just says, they didn't follow the testing

9    procedures.

10           Plaintiff also heavily rely on *NFL PAB NFL* case,

11   which is also distinguishable.  Unlike the *NFL* case, which

12   was about steroids, this is actually about mind-altering

13   illegal drugs.  It's not just someone getting on the field

14   with a couple of other people.  This is someone getting into

15   this race car.

16           In the *NFL* case, none of the plaintiffs actually

17   tested positive for steroids.  They tested positive for a

18   substance that wasn't even listed as being banned.  Unlike

19   here, Mr. Mayfield ingested a banned and illegal substance.

20           The primary factor underlying *NFL's* finding of

21   irreparable harm, was the limited duration of a NFL player's

22   career.  Today the average age of an NFL player is 27.

23   That's quite different for NASCAR, where several drivers are

24   driving into their fifties.

25           Mark Martin, who has more victories this year

1   alone, just turned 50 in January.  Joey Lagano, who just won

2   last week, is 18.  So you have at least a 32 year career

3   span there.

4           But I think most importantly is the fact that

5   Mr. Mayfield admitted in his affidavit, that he expects to

6   have another 10 years to his career.

7           And I think even the most important factor from

8   the *NFL* case, and that's a page 983, is that it's stated

9   that it was only entertaining, that preliminary injunction

10  motion, because of the highly unusual facts in that case.

11          And here there are no highly unusual facts.  In

12  fact, the best that we have again, is that there's a

13  possibility that something must have gone wrong, but there's

14  no detail to what might have happened.

15          To the extent Mr. Mayfield has any damages that

16  can be compensated by money, he talks about having cash flow

17  problems, being forced to borrow money, he wants to race

18  again, out of fear for what's going to happen to his wallet,

19  basically.

20          He's also failed to show that irreparable harm is

21  actual and imminent.  He has to make a clear showing of

22  that.  He has to make sure that it's not speculative.

23          It's impossible for plaintiffs to prove any

24  imminent harm, particularly given that Mr. Mayfield's

25  participation in NASCAR is subject to NASCAR's sole

1     discretion.

2          This year alone, Mr. Mayfield has tried to become

3     eligible for 11 races, but only has made it to race five

4     times.  So for any given race, it's more likely than not

5     that he's not going to make it.

6          Plaintiffs contend that defendants will suffer no

7     harm if a preliminary injunction is issued.  As I already

8     discussed some of the safety issues, here are a few more.

9          For NASCAR, it is a family-friendly sport.  If a

10    methamphetamine user is permitted to race in NASCAR events,

11    families will likely not want to bring their children to see

12    the races, or support a sport that generally has had a more

13    wholesome reputation than other sports.  And it will be

14    tarnished if people think that NASCAR allows drug users to

15    race.

16         The other harm that will happen is the fact that

17    the drivers are relying on NASCAR to safeguard them against

18    unnecessary harms.  They expect NASCAR to minimize their

19    risks.

20         One of the expectations that they have, is that

21    NASCAR will prevent drivers who are on drugs from being on

22    the track.

23         Some of NASCAR's top drivers, Jimmy Johnson and

24    Jeff Gordon, submitted affidavits in this case and stated,

25    "I am not willing to put my life at risk, driving a race car

1    on a NASCAR track, with drivers testing positive for drugs,

2    that diminish their capacity to drive a race car.

3    "I support NASCAR's substance abuse policy, and

4    depend on NASCAR to prohibit drivers who don't abide by the

5    policy from racing."

6    Mr. Mayfield's colleagues further state, "If

7    drivers are on the track in violation of NASCAR's substance

8    abuse policy, it presents serious questions as to whether or

9    not it makes sense for me to put my life at risk."

10    So without drivers to race, NASCAR will be in

11    breach of a host of contracts.

12    NASCAR is a sanctioned body for its sport, has

13    identified Mr. Mayfield as a danger to others.  And this

14    determination should not be undone at the judicial level.

15    Issuing an injunction will strip NASCAR of its

16    authority to maintain the integrity of the sport and to keep

17    it safe.

18    In effect, every time a driver doesn't like a

19    penalty that he receives, he will race to the court and he

20    can get it undone and he can get it back on the track,

21    regardless what type of drugs --

22    THE COURT:  How fast can Aegis test a urine

23    sample?

24    MS. MAHER:  It takes approximately four days, Your

25    Honor.  They could -- I assume that plaintiff's counsel is

1    going to argue to do an on site immediate test.  But those

2    have a high incidence of false positives.

3             So in effect, you would be accusing a lot of

4    people of doing drugs, and it wouldn't be correct.  Because

5    the tests are not sophisticated enough, and they're not

6    sensitive enough.

7             THE COURT:  Would it not be possible for you to

8    test Mr. Mayfield before he attempts to qualify in anything

9    and determine whether he's a habitual methamphetamine user?

10            MS. MAHER:  No, Your Honor, for two reasons.

11   Number one, is that the tests -- if you want a real

12   sophisticated test, that's going to examine the entire

13   spectrum of drugs, it does take about four days.

14            THE COURT:  You only have one you're looking for.

15   That's what you're basing all of this on.

16            MS. MAHER:  That's correct, Your Honor.  It's

17   still my understanding that it still will take approximately

18   four days for that.

19            THE COURT:  Four days.

20            MS. MAHER:  Well, no other sports league uses the

21   same day on test -- testing devices.  It's just the way the

22   technology is right now.

23            The public interest has -- the public has an

24   interest in safety requirements, as well.  In *Snap-N-Pops*

25   *versus Browning*, the Court held that the movant's interests

1  were outweighed by the public's interest in maintaining the

2  safety of its citizenry.

3          Similarly here, the public interest and the safety

4  of the drivers, teams and fans, warrants that this

5  injunction not be issued.

6          The State of North Carolina prohibits its

7  residents from operating machinery while they've ingested

8  illegal drugs, and even in possession of illegal drugs.  And

9  the reason the state has those statutes, is to protect its

10  citizens from harm.

11          Likewise, NASCAR has its substance abuse policy to

12  protect the drivers in the race, as well as to protect the

13  fans.

14          NASCAR has prevented Mr. Mayfield from continuing

15  to endanger the lives of everyone around him on that track.

16  If he is allowed to race again, while this litigation is

17  pending, it is possible he will end up hurting or killing

18  someone.

19          It is this irreparable harm, the possibility of

20  serious injury or death, that the Court should consider when

21  evaluating Mr. Mayfield's request for a preliminary

22  injunction, not the alleged damages to his finances.

23          THE COURT:  All right.  You've used up a half an

24  hour.  You've got 15 minutes left.

25          MR. HENDRICK:  Thank you, Your Honor.

1          Your Honor, I would like to call to the Court's

2     attention that the France family has been and continues to

3     be the owner of the NASCAR brand through a Florida

4     corporation.

5          That's important in this case, because its stock

6     is not publicly traded.  It's not a federal agency.  It's

7     not associated with the state government.

8          Drivers are licensed for the privilege to compete

9     for points and prize money won and awarded under NASCAR's

10    rules.

11         Drivers are not employees of NASCAR, they are

12    licensees.  And as a result, Mayfield is going to have to

13    show the Court some standard which was breached -- a duty

14    which was owed, and a standard which was breached, in order

15    to qualify it under the test of likelihood of success on the

16    merits for a preliminary injunction.

17         What we heard at the TRO hearing in state court,

18    and what we have heard today in federal court, is that the

19    Plaintiff, Mayfield, seeks to avoid the stark results of his

20    urine testing positive for methamphetamine, by presenting to

21    the Court the standard of the Federal Workplace Guidelines.

22    That's what we heard Mr. Diehl talk about.

23         There are three reasons, Your Honor, any one of

24    which is sufficient to avoid the Federal Workplace

25    Guidelines as a standard.

1        But the first and foremost of those is that the

2   Federal Workplace Guidelines are reported in 69, in the Code

3   of Federal Regulations.

4        And in it, under Section 1.1, there is a provision

5   that says, "These Federal Workplace Guidelines are only to

6   be applied to executive agencies, uniformed services and

7   federal governments, government employing agencies".  That's

8   it, Judge.

9        So the standard that is being purported to be

10  asserted, is not applicable in a private scenario.

11       I would point Your Honor's attention to the Fourth

12  Circuit case of *Cooper versus Lab Corp*.  It's decisive on

13  this point, Your Honor.

14       In that case, a former employee sues Lab Corp

15  alleging negligence, defamation and intentional interference

16  regarding urine tests.

17       The Court says, and I'll quote from page 379.

18  "The Guidelines do not, however, govern a laboratory's

19  duties to private employers through -- though private

20  employers must be notified if a laboratory loses its

21  certification."

22       So the bottom line, we have the Fourth Circuit

23  telling us, and following Section 1.1 of the Code of Federal

24  Regulations saying that applying these Guidelines -- and

25  they are the only Guidelines, Your Honor, which Mr. Diehl

Case 3:09-cv-00220-GCM   Document 30   Filed 07/02/09   Page 45 of 67

1   has suggested as imposing a duty upon NASCAR -- that these

2   Guidelines are inapplicable.

3           Now, I said three items.  There are three items,

4   Your Honor.  And while the first two are certainly

5   conclusive on this Court, being statutory as well as case

6   law from the Fourth Circuit, I would just like to point Your

7   Honor's attention to an affidavit which we filed in

8   connection with various affidavits that were filed in this

9   case.  And this affidavit is by Kenneth Edgell.

10          Mr. Edgell is currently the senior policy adviser

11  to the American Medical Review Officers to DOT and non-DOT

12  drug tests.  However, prior to that time, he was the U.S.

13  DOT employee for seven years.  He managed the DOT's drug

14  testing programs for 33,000 federal employees.  And for

15  three years, he was the director of The Office of Drug and

16  Alcohol Policy Compliance.

17          Basically his affidavit says that he is the

18  primary author of the Federal Workplace Drug Testing

19  Procedures.  His affidavit is before you.

20          And I would point Your Honor's attention to

21  paragraphs seven and eight of that affidavit, in which Mr.

22  Edgell says, "the NASCAR substance abuse policy does not

23  follow the SAMHSA Mandatory Guidelines for Federal Workplace

24  Drug Testing Programs, nor is it required to do so.  In

25  fact, the mandatory Guidelines were not intended to be

1  applicable to any agency other than those specifically

2  stated in paragraph six above."

3          Those limited to the three that I mentioned, Your

4  Honor.

5          "The mandatory guidelines specifically prohibit

6  SAMHSA -- specifically prohibit SAMHSA-certified

7  laboratories from representing that non-federal testing has

8  been conducted according to SAMHSA federal requirements.

9          "I am aware that Aegis Sciences Corporation is a

10 SAMHSA-certified laboratory.  However, in its testing

11 procedures for NASCAR, a private company", Your Honor,

12 "Aegis is not subject to SAMHSA Mandatory Guidelines.

13         "Further the SAMHSA mandatory guidelines

14 specifically prohibit the testing for the many drugs of

15 concern addressed in NASCAR's substance abuse policy."

16         In other words, if we follow the Mandatory Federal

17 Guidelines, which are being urged on this Court as a

18 standard, we would find that the many drugs that NASCAR

19 seeks to test for, in order to keep its drivers, its crews,

20 its officials, and the public safe, would not be able to be

21 on the list.

22         So Your Honor, on those three counts, I suggest to

23 this Court, and I argue to this Court, that no standard has

24 been presented to the Court, for which the plaintiffs in

25 this case would be able to prove on the merits, a breach of

1    duty.  There is none presented by them, and it is their

2    burden to do so.

3            Likewise, Dr. Black's affidavit speaks to the same

4    issues.

5            And then, trying not to beat a dead horse here,

6    likewise, the MRO manual for Federal Workplace Drug Testing

7    is also inapplicable.  Because that MRO manual specifically

8    relates to federal employee drug tests.

9            So what we have here, Your Honor, is a flurry of

10   activity to try and convince the Court that a standard has

11   been presented, when in fact a standard has not been

12   presented.

13           The plaintiff's primary premise is based upon the

14   Workplace Guidelines.  So what of it at that point then?

15   What is at the heart of Mayfield's argument to this Court

16   for a preliminary injunction.  What is at the heart of it?

17           I believe and suggest to Your Honor what's at the

18   heart of it, is that the "A" and "B" samples were tested by

19   the same laboratory, by Aegis Science Corporation.  I think

20   that's what's really got them in a knit.

21           Of course, probably the thing that's got them in a

22   knit more than anything else, is that Mr. Mayfield tested

23   positive for methamphetamine.  But --

24           THE COURT:  How does Mr. Mayfield contest a

25   false-positive?  What remedy does he have, if any, to

1  attempt to deal with that?

2        MR. HENDRICK:  Your Honor, there is no remedy for

3  him to contest a false-positive, until he sees the testing

4  results.  And from those testing results, if he can

5  determine that machines were not calibrated correctly, if

6  tests were not properly prepared, under the proper

7  supervision, under the proper controls, the screening that

8  takes place before these tests are ever done, Your Honor,

9  this is a multi-stage procedure.

10        And in fact, we have given, voluntarily, before

11  discovery commenced, approximately 400 pages of these

12  results, detailed analysis of exactly what was screened for

13  and tested for.

14        Your Honor, if there are mistakes with respect to

15  that data, let's see it.  We haven't seen it.  What we have

16  seen is an argument that Adderall and Claritin-D, when taken

17  together produce massive amounts of methamphetamine in the

18  human body, which is a statement that is untrue, Your Honor.

19        And I point Your Honor to Dr. Black's affidavit on

20  page six, paragraphs 35 and 36, where he addresses this very

21  issue.

22        Now, I have not had time to study the document

23  that Your Honor's read.  I don't know who did it.  I don't

24  know what it says.  But I did glance at one paragraph that

25  says that you can take Claritin-D, and you can take

1    Adderall, and as a result you can have methamphetamine in

2    your body, if that's a correct statement.

3            But in any event, we do not believe that that is

4    fact, scientific.  And we do not believe it is demonstrable.

5            We have Dr. Black who will state that.  We have a

6    medical doctor, Dr. Aukerman who is our MRO who will state

7    that.  And also Dr. Tim Robert.  All of whom eminently

8    qualified, world renowned.

9            Basically the question is, it seems to me,

10   returning to the *Cooper* case, Your Honor, the question is,

11   what is the standard.  And I think that may be what Your

12   Honor is asking.  And I think on the same page, page 379 of

13   the *Cooper* case, we get a very clear answer from the Fourth

14   Circuit.

15           It says:  "In professional negligence causes of

16   action, a plaintiff must establish that the professional

17   failed to conform to the generally recognized and accepted

18   practices in its profession".  A clear statement.

19           And, Your Honor, what are the facts before you

20   with respect to this affidavit.  Dr. Black's affidavit

21   specifically addresses this standard.

22           And that among sports organizations in the United

23   States of America, he states, "It is common for the "B"

24   sample to be tested in and by the same laboratory".

25           What support do we have for that in his affidavit?

1         Both the World Anti-Doping Agency and the U.S.

2    Anti-Doping Agency require that the same laboratory be used,

3    Your Honor.  I want to say that again, if I may.  The same

4    laboratory be used, for the testing of the "A" and the "B"

5    sample.  These are two leading agencies in sports drug

6    testing in the world.

7         In addition to that, other sports organizations

8    that require the same laboratory to be used for the testing

9    of the "B" sample include the National Football League, the

10   National Hockey League, Major League Baseball, the Indy

11   Racing League.  And that's among others, Your Honor.

12        And A fascinating argument to me was made by Mr.

13   Diehl.  He said, oh, well, don't pay any attention, Your

14   Honor, to the NFL.  Don't pay any attention to the National

15   Hockey League or Major Baseball League.  Gosh, those are all

16   collectively bargained agreements.

17        Well, Your Honor, it seems to me that that is the

18   exact support for the argument.  If they're collectively

19   bargained agreements, if the players who are going to be

20   tested, agree to same laboratory testing in those

21   circumstances, and you have a wide range of people, much

22   larger group than our group, it seems to substantiate

23   exactly what *Cooper* proposes as the test, Your Honor.

24        But lest we leave collective bargaining agreements

25   and return to private agencies, we find that the Indy racing

Case 3:09-cv-00220-GCM   Document 30   Filed 07/02/09   Page 51 of 67

1    league is exactly like NASCAR.  And it's one of those groups

2    that uses same laboratory testing.

3           So whether it's collectively bargained or whether

4    or not it's privately owned and not collectively bargained

5    and not unionized, we find the same standards and rules

6    across the spectrum of sports.

7           THE COURT:  Five minutes.

8           MR. HENDRICK:  Thank you, sir.  I appreciate that.

9           I believe that there is a failure to present the

10   Court with a standard from which the Court can say I see the

11   standard, I see a breach of duty, and I see a likelihood of

12   success on the merits.  And it does not exist.

13          I will point the Court's attention, if I may, to

14   the two affidavits that were filed in connection with the

15   plaintiff's expert testimony.

16          One -- you will have to forgive me, I can't

17   pronounce this it's Janine S. Arvizu -- or something like

18   that.

19          And in this affidavit she states on chain of

20   custody, which I want to address in my last two minutes.

21          "The urine sample cup that Mr. Mayfield was

22   instructed to use was from a cluttered table top.

23   Mr. Mayfield was not instructed to witness the sample being

24   split into two sample bottles, the placement of the labels

25   and seals on each bottle.  Mr. Mayfield was directed to two

Case 3:09-cv-00220-GCM   Document 30   Filed 07/02/09   Page 52 of 67

1    initial samples with adhesive backings, but he didn't

2    witness the placement of those with the specimen."

3           She then goes on to say, as part of the basis for

4    her opinions that "Aegis is expected to conduct NASCAR

5    testing in accordance with technical requirements and

6    quality standards established for SAMHSA laboratories for

7    certification."

8           And in other words, "because NASCAR requires the

9    testing laboratory to be SAMHSA certified.  And because

10    Aegis and NASCAR have not identified any other standards to

11    follow, therefore SAMHSA Guidelines should be used when

12    testing urine."

13           Your Honor, there is no support for that.  There

14    is no basis for that conclusion.  But more particularly, the

15    premise that she is using to draw her subsequent conclusions

16    is wrong, it's flawed, as we have just shown by looking at

17    the statute and Fourth Circuit.

18           Running along, Your Honor, I want to call to the

19    Court's attention, Mr. Plotnick's affidavit, a gentleman

20    submitted as an expert for Mayfield.

21           And with respect to Plotnick's affidavit, he also

22    says, on page two of eight, Your Honor, that "Guidelines and

23    procedures set forth policy required to be followed by its

24    certified labs in taking, processing, testing and reporting

25    results for various drug tests.  I understand that

1  Dr. Black, a representative of Aegis Science Corporation,

2  the laboratory that tested Mr. Mayfield's urine sample, has

3  admitted that Aegis complies and utilizes the guidelines and

4  procedures of every specimen test, including the test

5  performed by Mr. Mayfield's specimens."

6  That is, of course, Your Honor, untrue.  Where we

7  to do that, we would be in violation of the Code of Federal

8  Regulations.  And of course it is not true.

9  Therefore, all the rest of his conclusions are

10  based on a faulty premise, that we either should or must

11  follow the Federal Workplace Guidelines.

12  I suggest that in these two affidavits, because of

13  the flawed basis of them, Your Honor, I suggest there is no

14  evidence that the plaintiff has offered to this Court, of

15  likelihood of success on the merits.

16  And more particularly, when we look at the five

17  other affidavits that have been filed in this case, along

18  with Mr. Plotnick and Ms. Janine, we find that they say,

19  gosh, I looked at Jeremy and he looked fine to me.  That's

20  what the affidavits say.  I suggest to Your Honor, that that

21  is evidence with regard to the ingestion of methamphetamine.

22  I would also suggest to Your Honor -- and there is

23  one piece of evidence that no methamphetamine was ingested

24  by Jeremy Mayfield; it's his affidavit.  He says so.

25  Now, Your Honor, in the courts of this land,

Laura Andersen, RMR 704-350-7493

1  federal and otherwise, if you can come in, take scientific

2  testing of sports organizations and trump it simply with an

3  affidavit that says, gosh, I didn't do it, then we will have

4  an onslaught of athletes, employees and others to get TRO's

5  and preliminary injunctions, the like of which will be a

6  large flow.

7       That's not what the law provides.  That's not the

8  standard that must be shown.  And we need to see a standard

9  from the plaintiffs that they intend to proceed on that is

10 lawful.

11      Finally, Your Honor, I just -- I realize I'm just

12 about out of time, if you indulge me --

13      THE COURT:  I'm indulging you now.  You are out of

14 time, but go ahead.

15      MR. HENDRICK:  All right, sir.

16      My final point that I would like to make to the

17 Court is that Thomas L. Carter's affidavit, he was the

18 collector on the scene.  We see in the verified complaint,

19 and we see in the brief, the allegation that Mayfield didn't

20 see the urine collection.  He didn't see it occur.

21      But, Your Honor, he stated that, and I quote --

22 let me see if I can read it here, it's a little bit easier.

23      "I certified that I provided my urine specimen to

24 the collector.  That I have not adulterated it in any

25 manner.  That each specimen bottle used was sealed with a

1  tamper-evident seal in my presence.  And that the

2  information provided by this form and on the label affixed

3  to each specimen bottle is correct."

4          That's his certification.

5          Now, Your Honor, he makes a different

6  certification in his verified complaint.

7          I suggest to the Court that someone's going to

8  have to decide whether or not Mr. Mayfield was correct when

9  he drew his verified complaint and he knew he'd been

10 suspended for being caught with methamphetamine being found

11 in his body.

12         Or was he correct when he certified that he saw

13 all those things to the collector, an FBI agent with 26.5

14 years of experience, a special agent in Washington, D.C. and

15 Virginia.

16         Your Honor, I think that as we look at the facts

17 of this case presented to date by the plaintiff, there is no

18 evidence, credible evidence, on which this Court can issue a

19 preliminary injunction.

20         And thank you for your indulgence.

21         THE COURT:  Thank you.

22         Mr. Diehl, do you wish to be heard in rebuttal?

23         MR. DIEHL:  Yeah.  Briefly, please, Your Honor.

24         I wrote down, what is the standard that guides

25 NASCAR, other than what they decide it is after the fact.

1  What's the standard.

2         You asked the lawyers to tell you what the

3  standard is.  They don't have an answer.  They have a

4  procedure that has no standard, according to them, and

5  allows them to deprive someone with no opportunity -- as you

6  asked, as you ask them to own it -- no opportunity for

7  Mr. Mayfield to prove they're wrong.  None.  It's rock along

8  with us.  Because we say it's so, therefore it's so.  That

9  cannot be the law.  They get to decide the standard.  And

10 they can make the standard what they want it to be today or

11 tomorrow or the next day.

12        We entered into a contract with them to race.  We

13 entered into a contract with them to abide by their drug

14 policy.  They have a drug policy that requires a SAMHSA lab.

15 It must be a SAMHSA lab.  We are entitled to believe and

16 rely that they'll handle the testing pursuant to the law.

17 And they basically admit they don't.

18        And that's caused Jeremy Mayfield irreparable

19 harm.  It couldn't be clearer that the man has no remedy

20 whatsoever; that itself is irreparable harm.

21        He can try the case, they say.  He can spend a

22 million dollars to try to show that the lab work was wrong.

23        But the point they continually miss, is that there

24 isn't any opportunity for him, at any early stage in the

25 proceedings to challenge their findings.

1          They admit, they take the "B" sample and they

2  spoil it.  And the rules of SAMHSA is that you don't test a

3  spoiled sample.  I don't care what it's got in it.

4          THE COURT:  What do you say about his observations

5  that they are not permitted to follow the Federal Workplace

6  Policy.

7          MR. DIEHL:  Well, I say that's a wrong

8  interpretation of their own rules.

9          It's like he tells you the World Anti-Doping

10  Agency, WADA, doesn't require an "A" and "B" sample, and

11  doesn't permit Mr. Mayfield to decide where the "B" test is

12  made.

13          But if you read the rule at page -- rule 7.2, the

14  Sample may be -- the Sample "B" analysis, the schedule,

15  date, time and place of the Sample "B" analysis, if the

16  athlete" -- they're talking about athletes -- "chooses".  He

17  gets to choose.  Which is directly contradictory to what

18  he's telling you and what his expert says is the rules.  We

19  don't operate under SAMHSA, we operate under WADA.

20          And the doping -- the doping testing under any

21  factual circumstance that's reasonable, requires an

22  opportunity to challenge it at some early point in the

23  process.  And they've eliminated that.  And they did it on

24  purpose.

25          And the business about the -- somehow we could say

Case 3:09-cv-00220-GCM   Document 30   Filed 07/02/09   Page 58 of 67

1  this over and over and over again the same way, you haven't

2  established a standard, avoids the reality that they don't

3  have a standard that we can establish, except by relying on

4  the documents that we sign.  That's all we know that we can

5  do.

6           The presentation proves nothing contradictory to

7  what Mr. Mayfield has shown, Your Honor.

8           He's shown irreparable harm.  He couldn't show it

9  any more.  He's shown that the harm to him without an

10 injunction, is greater than the harm to them if the

11 injunction is granted.  He's shown that they never had a

12 standard.  That he's entitled to the relief on the merits of

13 his claim.

14          And my God, the public policy that this woman and

15 this man talk about, that he's driving around a track at

16 200 miles an hour endangering drivers.  What if he's not

17 endangering anybody, because he hasn't taken any drugs.

18          I mean, their premise is bargained on the

19 presumption he's guilty.

20          THE COURT:  Tell me about that North Carolina

21 Statute.

22          MR. DIEHL:  95-230.  The public policy of North

23 Carolina requires drug testing just like we say it ought to

24 be.  It requires the "B" test by a separate independent lab,

25 and says so.

1          And if you read that Industrial Commission

2     opinion, it says it there.

3          "The drug testing guidelines are strikingly

4     similar to the drug test authorized pursuant to 95-230."

5          So that's North Carolina Guidelines.

6          "The General Assembly, 95-230, "provides that

7     individuals should be protected from unreliable and

8     inadequate examinations and screening for controlled

9     substances."

10          So the General Assembly finds that the employees

11    who want to test -- the employers who want to test their

12    employees, must do so in accordance with the statute.

13          The statute then creates the twin in Section F on

14    232-F, "Retesting of positive samples.  The examinee shall

15    have the right to retest a confirmed positive sample at the

16    same or another approved lab.  The examiner, through the

17    approved laboratory, shall make all confirmed positives" --

18    the rest of that is not really helpful.

19          But me, as the person that's found on Sample "A"

20    to have a positive test, can require it be tested by a

21    separate lab, the "B" sample.  And we can not do that here,

22    ever.

23          So I ask Your Honor to rule, as I believe the

24    record requires, notwithstanding the pomposity of the NASCAR

25    people that say, we can do anything we want to do and it's

Laura Andersen, RMR 704-350-7493

1  tough luck.  I don't think that's the law.  That's not what

2  courts are for.

3          I appreciate you --

4          THE COURT:  We're going to take a 15 minute

5  recess.  I will return in 15, maybe 20 minutes, and I will

6  issue an order.

7  (Recess.)

8          THE COURT:  All right.  Good afternoon, counsel.

9          I've heard the arguments of the parties, I've

10 reviewed the briefs, the evidence submitted.  And I'm now

11 going to make a ruling on Motion for Preliminary Injunction.

12          The standard for issuance of a preliminary

13 junction is the balance of hardship test, stated in the

14 *Blackwelder Furniture Company v. Seilig Manufacturing*

15 *Company 550 F.2d 189*.  It is the Fourth Circuit, basically

16 seminole test on balance of hardships.

17          Also *Rum Creek Coal Sales V Caperton* and *Direx*

18 *Israel, Ltd*., both of which are standards in the field.

19          There are four tests that the Court must apply in

20 order to determine whether an injunction is to be issued or

21 not.

22          The first two are the most critical:

23          First, is the likelihood of irreparable harm to

24 the plaintiff without the temporary injunction.

25          Second, the likelihood of harm to the defendant

1 with the injunction.

2         Third, the plaintiff's likelihood of success on
3 the merits.

4         And fourth, the public interest.

5         The movant bears the burden of establishing that
6 each of the four factors supports the issuance of an
7 injunction.

8         And with regard to the first element, the movant
9 must make a clear showing of irreparable harm as a condition
10 for the grant of a preliminary injunction.

11         If the plaintiff succeeds in doing this, the Court
12 must then balance the first two factors.  If after balancing
13 the first two factors, the balance tips decidedly in
14 behavior of the plaintiff, a preliminary injunction will be
15 granted.

16         Quote, "If the plaintiff has raised questions
17 going to the merits, so serious, substantial, difficult and
18 doubtful, as to make them fair ground for litigation and
19 thus for more deliberate investigation", citing *Blackwelder*
20 550 F.2d page 195.

21         "If however, the hardship to the plaintiff is
22 minimal or non-existent, than the burden on the plaintiff to
23 establish the likelihood of success on the merits becomes
24 considerably greater."  Citing *Direx Israel*.

25         "Specifically, if the balance of hardships does

Case 3:09-cv-00220-GCM   Document 30   Filed 07/02/09   Page 62 of 67

1    not tip decidedly in plaintiff's favor, plaintiff must make

2    strong showing of substantial likelihood of success on the

3    merits by clear and convincing evidence."

4           And "if there is doubt as to the probabilty of

5    plaintiff's ultimate success on the merits, the preliminary

6    injunction must be denied."  Again, siting *Direx Israel* page

7    813.

8           Plaintiff Jeremy Mayfield and MMI -- and I agree,

9    MMI is not entitled to any injunctive relief.  MMI has not

10   been suspended.  MMI can hire a driver and race all they

11   want to.

12          The plaintiff Jeremy Mayfield claims he will

13   continue to lose crucial advertising sponsorship and

14   business opportunities.  Each race he misses, worsens his

15   position and the stigma which goes along with his situation.

16          While the publication of this matter has been

17   widespread, certainly each race that he misses worsens his

18   position.

19          The Court finds that these circumstances may be

20   inadequately compensated by monetary damages, and finds that

21   Mayfield has sufficiently alleged irreparable harm.

22          Next, the Court must balance the harm to the

23   defendants if the injunction is granted, against the harm to

24   the plaintiff if it is denied.

25          NASCAR's arguments revolve around the safety of

Case 3:09-cv-00220-GCM   Document 30   Filed 07/02/09   Page 63 of 67

1    drivers, crews and spectators.

2         And enforcing the substance abuse policy is an

3    important aspect.  However, the Court finds that the harm to

4    Mr. Mayfield substantially outweighs any harm to NASCAR.

5         NASCAR can certainly require Mr. Mayfield to take

6    drug testing before he sets foot on a track.  He's not

7    driving with other drivers unless he qualifies.  They can

8    test him before, during and after the race.

9         I am not -- I am not persuaded that a four day

10    effort is required, in order to conduct an appropriate

11    scientifically accurate sample.

12         Furthermore, Mr. Mayfield can be required to cough

13    up a hair sample.  And we can find out from the hair sample

14    whether he's been a meth head or not.

15         I'm also interested in the incredible amount

16    48,000 nanograms per milliliter level of methamphetamine in

17    the system.

18         Contrary to the characterization from the

19    defendant, the affidavits from people who observed this man,

20    and particularly the police officer -- former police

21    officer, are entitled to some weight by the Court to show

22    that this likelihood of a false positive in this case is

23    really quite substantial.

24         So I find that the balance of harm tips decidedly

25    in the plaintiff's favor.

1       That the defendant is minimally harmed, if at all,

2   and capable of protecting itself against any further damages

3   and destructiveness from Mr. Mayfield, by simply drug

4   testing him, getting a sample of his hair and finding out

5   whether he is a meth head or not.

6       That, folks, means that the plaintiff has raised

7   questions going to the merits, so serious, substantial,

8   difficult and doubtful, as to make them fair ground for

9   litigation and thus for more deliberate investigation.

10       Public interest, while yes, the public interest is

11   in the safety, the public interest -- I realize this is an

12   employment statute.

13       But the public interest could hardly be more

14   clearly stated by the legislature of North Carolina in the

15   statute that was enacted.  That is in fact the essence of

16   the public interest when our legislature acts.

17       So I will issue a preliminary injunction,

18   directing that the ban on Mr. Mayfield be lifted.  And that

19   it is subject, however, to the fact that Mr. Mayfield will

20   have to comply with whatever drug testing requirements are

21   imposed right away on him, and continue to do so.  And we

22   will go forward with this matter.

23       I want the parties to get together, ASAP, on an

24   initial attorney's conference to see where we go with this

25   matter with discovery.

Laura Andersen, RMR 704-350-7493

1          And amongst other things, I think it would be a

2   real fine idea for everybody to take a deep breath, see if

3   you cannot come up with a methodology to resolve this

4   controversy, that is something other than, we can beat you

5   up anytime we want to.

6          And to recognize that there are levels of good

7   faith and fair dealing that are required in contractual

8   arrangements.

9          And we'll, I guess, have to see about all that

10  later on.

11          But that's the ruling of the Court today.  I

12  remain convinced that it's in the best interest of all the

13  parties that you do not go out and have major press

14  conferences, and tell the world how bad the Court treated

15  you; how great the Court treated you; how wonderful this

16  result is; how terrible this result is.

17          Go about your business, maintain your gag order.

18  Everybody knows the substance involved.  But let's go with

19  that.

20          MR. DIEHL:  Will you draft an Order, Your Honor?

21          THE COURT:  Say again?

22          MR. DIEHL:  Will you prepare an Order?

23          THE COURT:  My Order's going to say, for the

24  reasons stated in open court, the Motion for Preliminary

25  Injunction is granted.

1            Thank you, counsel.

2    (Proceedings concluded at 3:35 p.m.)

3                          (End of Proceedings.)

4                      * * * * * *
     UNITED STATES DISTRICT COURT
5    WESTERN DISTRICT OF NORTH CAROLINA
     CERTIFICATE OF REPORTER

6

7            I, Laura Andersen, Official Court Reporter,
     certify that the foregoing transcript is a true and correct
8    transcript of the proceedings taken and transcribed by me.

9            Dated this the 2nd day of July, 2009.

10

                              s/Laura Andersen
11                            Laura Andersen, RMR
                              Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    Laura Andersen, RMR 704-350-7493