IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:09-CV-220-MU

JEREMY ALLEN MAYFIELD and      )
MAYFIELD MOTORSPORTS, INC.,    )
                  Plaintiffs,  )
                               )
        vs.                    )            ORDER
                               )
NATIONAL ASSOCIATION FOR STOCK )
CAR AUTO RACING, INC., et al,  )
                               )
                  Defendants.  )
_____ )

## INTRODUCTION

THIS MATTER is before the Court on Defendants' Motion for Judgment on the

Pleadings. For reasons given below, Defendants' motion is GRANTED.

## BACKGROUND

Plaintiffs Jeremy Mayfield and Mayfield Motorsports, Inc ("MMI") (collectively

"Plaintiffs") bring suit against Defendants National Association for Stock Car Auto Racing, Inc.

("NASCAR"), Brian Zachary France, Aegis Sciences Corporation ("Aegis"), David Lee Black,

Ph.D, and Douglas F. Aukerman, M.D (collectively "Defendants"). This suit arises out of

NASCAR's suspension of Mr. Mayfield after he was reported to have tested positive for

prohibited substances, which violated NASCAR's Substance Abuse Policy ("the Policy").

Mr. Mayfield is a professional race car driver who participated in NASCAR sponsored

events across the United States, including North Carolina. NASCAR provides the races and

1

rules, and independent businesses provide the racecars, drivers, and crews. MMI is one such independent business, and Mr. Mayfield is its principal owner and driver.

To participate in NASCAR's "Sprint Cup" series, Plaintiffs had to sign several NASCAR agreements: the NASCAR Sprint Cup Series 2009 Driver and Car Owner Agreement ("the Agreement"); the NASCAR Competition Membership and License Application NASCAR Sprint Cup Series *Drivers* ("Drivers Application") (emphasis in original); and the NASCAR Competition Membership and License Application NASCAR Sprint Cup Series *Car Owners* ("Owners Application") (emphasis in original). Mr. Mayfield signed all three forms as a driver, a car owner, or both.

The Agreement requires that both driver and car owner "abide by the NASCAR Substance Abuse Policy ["the Policy"] , and car owner covenants that driver and the team's crew members are additionally tested for substance abuse under the car owner's or team's substance abuse policy." (Def. Mot. J. Plead. Doc 71-5 Ex. 3, NASCAR Agree. § 16.) Under the Policy, competitors must submit to random drug tests. All testing is to "be done at a facility or facilities . . . that have been certified by the Substance Abuse and Mental Health Services Administration ["SAMHSA"] of the United States Department of Health and Human Services ["HHS"] and/or by the College of American Pathologists Forensic Urine Drug Testing Program." (Compl. Doc. 1-1 Ex. A, NASCAR Policy § 5.) If a competitor tests positive for a prohibited substance, his NASCAR license will be revoked for an indefinite period. "Prohibited substances are those substances that, in NASCAR's determination, may affect adversely the safety and well-being of the Competitors, Officials and/or spectators or the performance of a Competitor or Official in or at a NASCAR Event, including but not limited to illegal drugs." (*Id.* at § 1.A.) NASCAR teams were also sent a list of drugs that must be included in their own

team confirmation tests: the list includes amphetamines and methamphetamines. (NASCAR Answer Doc. 3-1 at 2.). The Policy has the following release:

> NASCAR may publish the results of any test or tests conducted pursuant to this Policy and the circumstances giving rise to such test to such third parties as NASCAR, in its sole discretion, deems reasonable under the circumstances. The Competitor or Official shall have no claim or cause of action of any kind against NASCAR or any director, officer, employee, or agent of NASCAR with respect to such publication.

(Compl. Doc. 1-1 Ex. A, NASCAR Policy § 7.C.)

The Drivers Application and Owners Application are both two pages long, the second of which contains two release sections. Each release section is specifically titled, in bold and capital letters, as a "release." Each section has a signature line. One part of the first release section reads as follows:

> I recognize that the NASCAR Substance Abuse Policy promotes the integrity of NASCAR-sanctioned racing and the safety of NASCAR Competitors, Officials, and spectators. Accordingly, I HEREBY RELEASE, DISCHARGE, COVENANT NOT TO SUE, AND AGREE TO HOLD HARMLESS NASCAR, its officers, employees, directors, agents, and such testing facilities and Medical Review Officers as NASCAR retains or selects in connection with implementation of the Policy, as well as the officers, employees, and agents of each of them, and any other persons or entities against whom I might have a claim, from and/or for claims, damages, losses, or expenses of any kind, whether caused by negligence or otherwise, arising out of the implementation of the Policy, or any act or omission in connection therewith, including and without limitation, the testing of specimens and the publication of the test results and circumstances giving rise to such test or tests to any third party or parties by NASCAR or said testing facilities or said MRO, as well as the officers, employees, and agents of each of them, or any other persons or entities.

(Def. Mot. J. Plead. Doc 71-5 Ex. 1, Driver Application at 3, Ex. 2, Owner Application at 3) (emphasis in original).

On May 1, 2009, a NASCAR official asked Mr. Mayfield to take a random drug test. The test was performed by Aegis, a SAMHSA certified laboratory. Inside the testing trailer, Mr.

3

Mayfield was instructed on the procedures for providing a urine sample. Mr. Mayfield alleges that he was told "to select a urine cup from a cluttered non-sterilized table," which he did. (Compl. Doc. 1 ¶ 44.) Mr. Mayfield allegedly disclosed that "he had taken two Claritin-D pills within the past twenty-four hours," and he was told to tell Mr. Black—Aegis's CEO and test administrator—about his prescription drug use. *Id.* At that time, he did not disclose his use of Adderall XR. Mr. Mayfield was told to provide his sample in a restroom that, allegedly, "was neither secure nor sterilized." (*Id.* at ¶ 47.) He was then asked to initial two adhesive labels, which he gave to the specimen collector. Mr. Mayfield alleges that he did not see if the labels were affixed to his sample cup. Before leaving, Mr. Mayfield was given Mr. Black's contact information.

Mr. Mayfield alleges that he attempted to call Mr. Black immediately after providing his sample. They spoke two days later. Mr. Mayfield allegedly told Mr. Black that he took Claritin-D and added that he was taking Adderall XR pursuant to a prescription.

On May 7, 2009, Dr. Aukerman called and told Mr. Mayfield that his urine sample tested positive for a prohibited substance and asked for Mr. Mayfield's medical records. Mr. Mayfield provided his medical records that same day.

Mr. Mayfield alleges that Dr. Aukerman also called on May 8, 2009. During one of their two conversations, it is alleged that Dr. Aukerman said Aegis may have made a mistake in testing. Dr. Aukerman allegedly said that Aegis had frozen part of his urine sample, and that "Mayfield may want to have <u>them</u> [Aegis] test his 'B' specimen." (*Id.* at ¶¶ 61, 64) (emphasis in original). Mr. Mayfield alleges that he neither tried to prevent them from testing his B specimen nor authorized them.

4

Mr. Mayfield alleges that he then called Mr. Black and asked for a copy of his results, Mr. Black allegedly refused, "stating that the results were the 'property of NASCAR.'" (*Id.* at ¶ 67.) After several weeks, NASCAR sent the test results to Mr. Mayfield.

Mr. Mayfield alleges that on May 9, 2009, Aegis tested his B specimen and forwarded the results of both tests to NASCAR.

Later that day, a NASCAR representative informed Mr. Mayfield that he was indefinitely suspended from competition as both driver and owner. On May 11, 2009, Mr. Mayfield received a letter from NASCAR, which informed him of his opportunities for regaining his licenses to compete.

On May 15, Mr. France—NASCAR's chairman—held a press conference in which "he stated to reporters that Mayfield was suspended because he took a 'performance-enhancing' or 'recreational' drug.'" (*Id.* at ¶ 73.) Mr. Black also told reporters that "Mayfield's positive drug test results were not related to an over-the-counter drug or a prescription medication. Black stated, "'They were not the cause, and could not be the cause, of his result.'" (*Id.* at ¶ 75.) Mr. France and Mr. Black's remarks were allegedly "intentional, malicious, reckless and false, and [they] know or should have known their statements were false." (*Id.* at ¶ 76.)

Mr. Mayfield brought suit in the Superior Court of the State of North Carolina, County of Mecklenburg, and this matter has been removed on diversity jurisdiction. Mr. Mayfield prays for injunctive and monetary relief.

**DISCUSSION**

## I.    Legal Standard

A Rule 12(c) motion for judgment on the pleadings is judged using the standard for a Rule 12(b)(6) motion to dismiss. *Indep. News, Inc. v. City of Charlotte*, 568 F.3d 148, 154 (4th

5

Cir. 2009). When a court rules on a motion to dismiss, all well-pleaded allegations are accepted as true, and reasonable inferences are drawn in favor of the plaintiff. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). But a court need not accept as true legal conclusions or "unwarranted inferences, unreasonable conclusions, or arguments." *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (citation omitted). A plaintiff must allege facts in his complaint that "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), the Court held that "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting *Twombly*, 550 U.S. at 570)). A claim is plausible on its face "when the plaintiff pleads sufficient factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. When the allegations in a complaint do not "raise a claim of entitlement to relief," the complaint will be dismissed. *Twombly*, 550 U.S. at 554-56.

## II.  Florida Law Governs

Florida law governs the relationship between the parties. In both the Fourth and Eleventh Circuits, choice-of-law provisions are presumed valid. *Brock v. Entre Computer Centers, Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991); *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours and Co.*, 223 F.3d 1275, 1280 (11th Cir. 2000) (holding that choice-of-law provisions are presumed valid, and the party opposing the provision bears the burden of proving that the provision violates public policy). In *Brock*, the parties' agreement required the plaintiff to execute a release of all claims, the agreement also had a choice of law provision. (*Id*. at 1259.) The Fourth Circuit held

6

that the choice of law agreement was applicable to suits arising under the contract and the required release.

Mr. Mayfield—as driver and car owner—signed the Agreement. (Def. Mot. J. Plead. Doc 71-5 Ex. 3, NASCAR Agree. at 11.) Section 20 provides that "this Agreement shall be governed by and construed in accordance with the laws of the State of Florida applicable to a contract executed and performed in such State, without giving effect to the conflicts of laws principles thereof." (*Id.* at § 20.) Under the Agreement, Mr. Mayfield was required to "submit a 2009 NASCAR Membership and License application form," which contains a release and covenant not to sue. (*Id.* at §1.) Mr. Mayfield signed and submitted this application, once as a driver, and again as a car owner. Plaintiffs have not met their burden of proving that the choice-of-law provision violates public policy; therefore, this Court will apply Florida law when construing the Agreement, the Drivers Application, and the Owners Application.

### III. Plaintiffs Waived Their Right to Sue Defendants for Claims Related to the Substance Abuse Policy

Plaintiffs released Defendants from all claims related to the substance abuse policy, and that agreement is enforceable. Under Florida law, a party can waive its right to sue for breach of contract, negligence, and intentional torts. *See*, *e.g.*, *Torjagbo v. United States*, No. 07-13728, 2008 WL 2736804, at *3-6 (11th Cir. July 15, 2008) (enforcing covenant not to sue under Florida law and barring negligence suit); *Universal City Dev. Partners, Ltd. v. Ride & Show Eng'g, Inc.*, No. 6:04-CV-781-ORL28-JGG, 2006 WL 845167, at *2-4 (M.D. Fla. Mar. 30, 2006) (stating that a court has "no choice but to effectuate" clear and unambiguous waivers of breach of contract, unjust enrichment, fraud and other claims—including intentional torts that do not cause "some great prejudice to the dominant public interest"); *Greater Orlando Aviation*

7

*Auth. v. Bulldog Airlines, Inc.*, 705 So.2d 120, 121-22 (Fla. Dist. Ct. App. 1998) (holding that negligence, breach of contract, and third-party beneficiary claims were barred by clause exculpating defendant from "*any and all liability*") (emphasis added); *see also* RESTATEMENT (SECOND) OF TORTS § 583 (1977) ("[T]he consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation.").

Here, Plaintiffs' first, third, fourth, and fifth claims are respectively based on defamation, unfair and deceptive trade practices, breach of contract, and negligence; and they all arise out of the implementation of the NASCAR Substance Abuse Policy. Mr. Mayfield signed a Drivers Application and an Owners Application. Both are two pages long, the second of which contains two release sections. Each release section is specifically titled, in bold and capital letters, as a "release section." Each section has a signature line. One part of the first release section reads as follows:

> I HEREBY RELEASE, DISCHARGE, COVENANT NOT TO SUE, AND AGREE TO HOLD HARMLESS NASCAR, its officers, employees, directors, agents, and such testing facilities and Medical Review Officers as NASCAR retains or selects in connection with implementation of the Policy, as well as the officers, employees, and agents of each of them, and any other persons or entities against whom I might have a claim, from and/or for claims, damages, losses, or expenses of any kind, whether caused by negligence or otherwise, arising out of the implementation of the Policy, or any act or omission in connection therewith, including and without limitation, the testing of specimens and the publication of the test results and circumstances giving rise to such test or tests to any third party or parties by NASCAR or said testing facilities or said MRO, as well as the officers, employees, and agents of each of them, or any other persons or entities.

(Def. Mot. J. Plead. Doc 71-5 Ex. 1, Driver Application at 3, Ex. 2, Owner Application at 3). This release clearly waives Plaintiffs' right to sue for a claim "caused by negligence or otherwise." By Plaintiffs' own admission, the term "otherwise" includes willful and grossly

8

negligent conduct. Florida law allows for the waiver of claims regardless of the level of culpability. *Universal City Dev. Partners, Ltd. v. Ride & Show Eng'g, Inc.*, 2006 WL at *2-4. The release therefore applies to the claims for defamation, unfair and deceptive trade practices, breach of contract, and negligence. [1]

Plaintiffs argue that the Release cannot apply to its intentional conduct claims.[2] Plaintiffs cite a series of inapposite cases in support of their argument. First, they do not cite Florida case law, which applies here. As discussed above, releases are enforceable under Florida law, even for intentional conduct. It is irrelevant if Maryland law, North Carolina law, South Carolina law, and New York law do not allow a party to grant a release for intentional conduct.

Plaintiffs further argue that the Release is wholly void because it purports to apply to willful or grossly negligent conduct. Again, this is not the law in Florida. The Release applies to claims caused by "negligence, or otherwise." This language is no broader than the clause in *Greater Orlando Aviation Auth.*, which freed the defendant "from *any and all liability* for loss of business or damages of any nature." 705 So. 2d 121-22.

Plaintiffs march out a parade of horribles that would result if the parties were allowed to contract around intentional torts, including the prospect of someone breaking into the lab and planting a positive urine sample. This Court acknowledges—in accordance with Florida law— there is a point when public policy would dictate that a release goes too far in its language or application; that instance is not before us. Plaintiffs have released Defendants from all claims arising under the Policy.

---

[1] Section 7.C of the Policy also releases Defendants from all defamation claims that are based on its actions under the Policy.
[2] This Court will not address whether the Release can apply to the North Carolina Persons with Disabilities Protection Act.

9

## IV. Plaintiffs Fail to State a Claim for Defamation

As discussed before, this claim is covered by multiple waivers that Plaintiffs signed, futhermore this claim fails on additional grounds. Plaintiffs do not state a defamation claim because they fail to allege facts that show actual malice. Plaintiffs instead resort to the type of "formulaic recitation of the elements of a cause of action" that the Supreme Court has held "will not do." *Twombly*, 550 U.S. at 555; *accord Iqbal*, 129 S. Ct. at 1951-52 (an allegation that defendants "knew of, condoned, and willfully and maliciously agreed to" discriminate against plaintiff is "nothing more than a formulaic recitation of the elements of a constitutional discrimination claim"; to survive dismissal a complaint must contain sufficient factual allegations to plausibly suggest the requisite state of mind); *Francis*, 2009 WL 4348830, at *8 (holding that merely alleging a legal conclusion "fails to assert a plausible claim").

The standard in defamation cases depends on whether the plaintiff is a public figure. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).[3] Mr. Mayfield has been a race car driver for 17 years, and as a NASCAR driver, he has been a participant in a popular, nationally televised sport. In Plaintiffs response, they do not dispute that Mr. Mayfield is a public figure. This Court, as a matter of law, rules that Mr. Mayfiled is a public figure.

In order to plead defamation, a public figure must sufficiently allege that the defamatory statements were made with "actual malice," *i.e.* "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* "Reckless disregard" requires that the speaker "in fact entertained serious doubts as to the truth of his publication." *St. Amant v.*

---

[3] Plaintiffs advocate for the following standard: "[I]n defamation actions, actual malice 'may be proven by a showing that the defamatory statement was made in bad faith, without probable cause or without checking for truth by the means at hand.'" (Pl. Resp. Doc. 95 at 13 (citing *Ward v. Turcotte,* 79 N.C.App. 458, 461 (1986) (internal citation omitted.)) In this case, the Court is compelled to use Defendants' standard, which was expounded by the United States Supreme Court.

10

*Thompson*, 390 U.S. 727, 731 (1968); *accord Hatfill v. N.Y. Times Co.*, 532 F.3d 312, 317 (4th Cir. 2008) ("The standard requires that the defendant have a 'subjective awareness of probable falsity' of the publication.'") (citation omitted).

Here, Defendants' statements allegedly "were malicious or were made with reckless disregard as to their veracity," (Compl. Doc. 1 ¶ 99.), but Plaintiffs fail to allege any facts to support this legal conclusion. Plaintiffs complain that two days after Mr. Mayfield provided his urine sample, he told Mr. Black, an Aegis employee, "that he had taken Adderall XR pursuant to a prescription as well as two Claritin-D pills to alleviate the symptoms from his allergies the day before providing the urine sample." (*Id.* at ¶¶ 52-54.) Twelve days later, Mr. France—NASCAR's chairman—announced that Mr. Mayfield had been suspended because he tested positive for a "performing-enhancing" or "recreational" drug. (Compl. Doc. 1 ¶ 74.)

Mr. Mayfield argues that "Defendant France knew or should have known that the combination of Adderall XR and Claritin-D could result in a false positive for methamphetamine use." (Pl. Resp. Doc. 95 at 13.) This is not a reasonable conclusion. Mr. Mayfield did not communicate his prescription drug history to Mr. France; Mr. France, after all, is not a drug testing specialist. Mr. France and NASCAR contracted with Aegis—a SAMHSA certified lab—for drug testing services. Mr. France and NASCAR were given results by the lab, and then Mr. France reported those results. No facts have been alleged as to why *Mr. France* would have any reason to seriously doubt the veracity of Aegis's results or the veracity of his own statements. Finally, Mr. France took care in sparing Mr. Mayfield additional embarrassment: instead of disclosing that Mr. Mayfield tested positive for methamphetamines—a heavily stigmatized drug—Mr. France used the terms "performing-enhancing" and "recreational" drug.

11

As for Mr. Black, Plaintiffs contend that after being told of the prescription drugs, Mr. Black should have known the results could be a false positive. Plaintiffs argue that Mr. Black "told reporters that Mr. Mayfield's positive drug test results were not related to an over-the-counter drug or a prescription medication, stating, '[t]hey were not the cause, and could not be the cause, of his result.' (*Id.* at 13 (quoting Compl. Doc. 1 ¶ 75.)) Mr. Black's statements evince the opposite of actual malice. Mr. Black was cognizant of the variables involved in Mr. Mayfield's specimen and confident that those variables could not account for the results. Even Mr. Mayfield's expert, Mr. Schueler, acknowledges that laboratories can accurately test for methamphetamines, even when the specimen contains Aderall XR and Claritin-D. Given the facts as alleged, this Court cannot reasonably infer or conclude that Mr. Black had serious doubts about the accuracy of the test results. In sum, Plaintiffs have not stated facts from which this Court can reasonably infer or conclude that Mr. Mayfield was defamed.

**V.    Plaintiff Fails to State a Claim for Breach of North Carolina Persons with Disabilities Protection Act**

Mr. Mayfield alleges that Defendants violated the North Carolina Persons with Disabilities Protection Act ("PDPA"), N.C. Gen. Stat. Ann. § 168A-5, when they discriminated "against [him] by discharging or suspending him on the basis of his disabling condition . . . and denying him the full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations of numerous places of public accommodation on the basis of his disabling condition."[4] (Compl. Doc. 1 ¶ 109-12.) Mr. Mayfield, however, was neither a NASCAR employee nor a person with a disability under the PDPA; therefore, his claim fails.

*a.   Mr. Mayfield was not a NASCAR Employee*

---

[4] This is a North Carolina based claim, and will be adjudicated under North Carolina state law.

The Act explicitly prohibits discrimination by an employer against a current or prospective employee. N.C. Gen. Stat. Ann. § 168A-5(a). Because the statute does not define the terms employer and employee, the Court will look to common law principles. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-23 (1992) (holding that when a statute uses the term "employee" without defining it, common law agency principles must be applied). When determining whether an employer/employee relationship exists, a court can consider a range of factors, including the following: (1) "the hiring party's right to control the manner and means by which the product is accomplished"; (2) "the skill required"; (3) "the source of the instrumentalities and tools"; (4) where the work happens; (5) the length of the working relationship between the parties; (5) "whether the hiring party has the right to assign additional projects to the hired party"; (6) "the extent of the hired party's discretion over when and how long to work"; (7) payment method; (8) "the hired party's role in hiring and paying assistants"; (9) "whether the work is part of the regular business of the hiring party"; (10) "whether the hiring party is in business"; (11) "the provision of employee benefits"; and (12) "the tax treatment of the hired party." *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 751-52 (1989); *accord Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 260 (4th Cir. 1997). "[N]o one factor is determinative, and the consideration of factors must relate to the particular relationship under consideration." *Cilecek*, 115 F.3d at 260. The above factors are non-exclusive, and other factors include whether "the parties expressly set out from the beginning to create an independent contractor relationship." *Id.* at 261.

Mr. Mayfield fails to show that he is an employee of NASCAR. The Court will start with the *Reid* factors. Mr. Mayfield owns his own business—MMI—and he does not allege that NASCAR controls the daily operating decisions of his business. Mr. Mayfield does, however,

13

allege that "NASCAR controls every aspect of the manner and means by which drivers [and] owners . . . conduct themselves in NASCAR-sanctioned events." (Compl. Doc. 1 ¶ 17.) Mr. Mayfield makes no allegations as to the skill involved in being a professional race car driver who participates in the Sprint Cup Series—NASCAR's premier series. He and MMI own their own cars, and thus provide their own instrumentalities—their race car and crew—for the events. Mr. Mayfield alleges that his work happens at facilities that are controlled by NASCAR. He states that he "has been racing stock cars for 17 years," but it is unclear whether all those years were with NASCAR. The complaint fails to allege whether NASCAR has the right to assign him additional work and the extent of Mr. Mayfield's discretion over when or how long to work. It is unclear how NASCAR compensates Mr. Mayfield's business, but the Agreement does state that awards will be given to car owners, and the owners are responsible for deducting taxes and paying their drivers and crew. Mr. Mayfield does not appear to receive a "wage" from NASCAR. Plaintiffs allege that NASCAR "awards prize money to race winners and overall series winners." Mr. Mayfield does not allege that NASCAR controls his ability to hire and fire assistants. NASCAR is indeed in business, and that business is racing. Mr. Mayfield does not allege that NASCAR provides him with benefits. Finally, NASCAR does not withhold taxes from Mr. Mayfield's prize earnings, and he is therefore responsible for paying his own "social security taxes, unemployment insurance taxes, workers compensation insurance, income taxes and withholding taxes." (Def. Mot. J. Plead. Doc 71-5 Ex. 1, Driver Application at 3, Ex. 2, Owner Application at 3)

In addition to the *Reid* factors, Mr. Mayfield, MMI, and NASCAR expressly set-out to avoid forming an employer/employee relationship. Mr. Mayfield signed the Drivers Application and Owners Application, which both contain a clause entitled "**NO AGENCY OR**

14

**EMPLOYEE RELATIONSHIP**." (*Id.*) (emphasis in original application). The clause reads as follows:

> I certify that I am not an agent or employee of NASCAR and that I will not become an agent of or employee of NASCAR as a result of NASCAR'S [sic] approval of my application. I further certify, that with respect to any activities in which I engage as a member and licensee of NASCAR, I am either an independent contractor or an employee of another person or entity.

(*Id.*)

While the Court acknowledges that some of the *Reid* factors point to an employer/employee relationship, Mr. Mayfield was not a NASCAR employee. Importantly, Mr. Mayfield owned MMI and his own car, and he drove that car in NASCAR races. NASCAR sanctions the races, but Mr. Mayfield decides how to run them. If and when Mr. Mayfield received an award for owning a car and driving that car, he was left to decide how to distribute that money to himself and his own employees. Mr. Mayfield also had to decide how to handle his responsibilities for taxes and insurance. Finally, Mr. Mayfield signed a document—twice over—in which he pledged that he was not forming an agency or employee relationship.

### b. Mr. Mayfield is not a "Qualified Person with a Disability"

Under the PDPA, a person has a disability if he has a "physical or mental impairment which substantially limits one or more major life activities . . . such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, *and working*." N.C. Gen. Stat. Ann. § 168A-3(7a) (emphasis added). A "plaintiff's condition must limit more than [his] mere ability to work a particular job in order for it to affect a 'major life activity.'" *Gravitte v. Mitsubishi Semiconductor Am., Inc.*, 109 N.C. App. 466, 471 (1993) (quoting *Burgess v. Your House of Raleigh, Inc.,* 326 N.C. 205, 214 (1990)).

15

Mr. Mayfield has not alleged sufficient facts from which the Court can reasonably conclude that he is a person with a disability. He fails to properly allege that his condition substantially limits any of the major life activities listed under the PDPA. Indeed, Mr. Mayfield alleges that he is able to "satisfactorily perform his job duties with reasonable accommodation" and that the medication he takes, Adderall-XR, "does not adversely affect the safety, performance and/or well being of anyone." (Compl. Doc. ¶ 33-34.) Mr. Mayfield argues that the question whether his "ADHD is a disabling condition is a disputed fact," (Pl. Resp. Doc. 95 at 18), but Mr. Mayfield's own admissions put any dispute to rest. Like *Gravitte*, Mr. Mayfield must do more than allege that his condition somewhat limits his ability to perform a particular job: he must allege that his condition substantially limits his ability to work any job. *See also* 29 C.F.R. § 1630.2(j)(3)(i) (1991) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.") [5]

Mr. Mayfield fails to show that he was either a NASCAR employee or a person with a disability under the PDPA; therefore, Mr. Mayfield cannot state a claim under the PDPA.

## III. Plaintiffs Fail to State an Unfair and Deceptive Trade Practices Claim

Plaintiffs released Defendants from all claims arising under the Substance Abuse Policy, which is enough to bar this unfair and deceptive trade practices claim. In addition, Plaintiffs fail to successfully state an unfair and deceptive trade practices claim.

To establish a *prima facie* case for unfair and deceptive trade practices under North Carolina law, a plaintiff must show the following: (1) an unfair or deceptive act or practice, (2)

---

[5] North Carolina courts "look to federal decisions for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases." *N.C. Dep't of Corr. v. Gibson*, 308 N.C. 131, 137 (1983); *see also Johnson v. Bd. of Trs. of Durham Tech. Comm. College*, 157 N.C. App. 38, 46 (2003) (stating that the PDPA "is the North Carolina equivalent of the ADA, sharing the common purpose of providing against disability discrimination").

16

in or affecting commerce, and (3) that the plaintiff was injured thereby. *Carter v. W. Am. Ins. Co.*, 190 N.C. App. 532, 541 (2008). A plaintiff does not need to show fraud, bad faith, deliberate or knowing acts of deception, or actual deception; rather, a plaintiff is required to show that the complained of conduct possessed the tendency or capacity to mislead, or created the likelihood of deception. *Chastain v. Wall*, 78 N.C. App. 350, 358 (1985) (quoting *Overstreet v. Brookland, Inc.,* 52 N.C. App. 444, 452-53 (1981)). "A party is guilty of an unfair trade act or practice when it engages in conduct that amounts to an inequitable assertion of its power or position." *See Eley v. Mid/E. Acceptance Corp. of N.C., Inc.*, 171 N.C. App. 368, 374 (2005) (internal citation and quotation marks omitted).

Plaintiffs first argue that Defendants intentionally misrepresented the proper testing procedure. This argument assumes that NASCAR and Aegis were required to follow the SAMHSA Guidelines and the MRO Manual. They were not. *See Cooper v. Lab. Corp. of Am. Holdings, Inc.*, 150 F.3d 376, 379 (4th Cir. 1998) (holding that SAMHSA certified labs are not required to follow the Guidelines when servicing private employers). [6]

Plaintiffs then claim that NASCAR's Substance Abuse Policy is unfair because it "fails to specify which drugs are prohibited under the Policy, instead simply stating that the substances prohibited are 'those substances that, in NASCAR's determination, may affect adversely the safety and well-being' of all those involved." (Pl. Resp. Doc. 95 at 22 (quoting Compl. Doc. 1 ¶¶ 29, 32.)) Plaintiffs complain that "NASCAR may determine that a particular substance is prohibited **after** discovery of the substance following a drug test." (*Id.*) Plaintiffs do not however allege that NASCAR decided to ban methamphetamines after Mr. Mayfield submitted

---

[6] Although the Guidelines have been revised since *Cooper*, Plaintiffs do not identify any changes that would require the Guidelines to be followed when a laboratory services private employers.

17

his sample. Methamphetamines are an illegal drug, and it goes without saying that they "'may affect adversely the safety and well-being' of all those involved." (Compl. Doc. 1 Ex. A, NASCAR Substance Abuse Policy § 1.A.) Further, before Mr. Mayfield was tested, NASCAR gave Plaintiffs a list of prohibited substances, including methamphetamines. (Answer Doc 3 Ex. 1.)

Finally, Plaintiffs allege that they had to wait more than two weeks until Defendants gave them Mr. Mayfield's test results. Plaintiffs cite no case law in which this kind of minor delay constitutes an unfair or deceptive trade practice. Plaintiffs therefore fail to state a claim of unfair and deceptive trade practices.

## IV.     Plaintiffs Fail to State a Breach of Contract Claim

Independent of the Release that already bars this claim, Plaintiffs fail to state a claim. Plaintiffs first argue that under the Policy, the Guidelines, and NASCAR's contract with Aegis; Defendants breached the contract because Aegis did not follow the Guidelines. Plaintiffs also contend that Defendants breached the contract by failing to label, transport, and secure Mr. Mayfield's specimen "in such a manner as to ensure that the specimen [was] not misplaced, tampered with, or relabeled." (Compl. Doc. 1 ¶ 120; Pl. Mem. Doc. 95 at 7-8.)

### a.   Defendants Were not Obligated to Follow the Federal Guidelines

Plaintiffs argue that there are three independent instruments that required Aegis to follow the Guidelines: (1) the Guidelines themselves; (2) the Policy, and (3) the NASCAR/Aegis service contract. None of these instruments mandates that the Guidelines be followed.

First, even when a lab is "certified to provide testing services for federal government agencies under the Mandatory Guidelines for Federal Workplace Drug Testing Programs . . . [t]he Guidelines do not . . . govern a laboratory's duties to private employers." *Cooper v. Lab.*

18

*Corp. of Am. Holdings, Inc.*, 150 F.3d 376, 379 (4th Cir. 1998) (citing Mandatory Guidelines for Federal Workplace Drug Testing Programs, 59 F.R. 29908 (June 9, 1994)). The Guidelines were promulgated to ensure that drug testing and reporting "procedures are uniformly applied to all *Federal agency urine specimens* when a validity test is conducted." (Compl. Doc. 1-1 Ex. C, SAMHSA Guide. at 2.) In Subpart A § 1.1 of the Guidelines, their applicability is limited to (1) Executive Agencies, (2) some of the Uniformed Services, (3) and all other Federal employees other than postal workers and employees in the Judicial and Legislative Branches. Plaintiffs submitted a copy of the Guidelines in which two passages were underlined; both discuss procedures relating to federal agencies and do not make any mention of private employers. (Compl. Doc. 1-1 Ex. C, SAMHSA Guide. at 4, 15.) This Court is not required to accept Plaintiffs' unsupported and unreasonable interpretation of the Guidelines. *See Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (citation omitted) (holding that a court need not accept as true a plaintiff's "unwarranted inferences, unreasonable conclusions, or arguments").

Second, the Policy did not require that Aegis follow the Guidelines. Plaintiffs' view is that "compliance with the Guidelines was *required* as a condition of Aegis's certification by SAMHSA, the very certification that qualified it to serve as a testing facility under NASCAR's Substance Abuse Policy [the Policy]." (Pl. Resp. Doc. 95 at 7-8) (emphasis added). The Policy, in relevant part, reads as follows:

> All testing will be done at a facility or facilities exclusively selected by NASCAR from among those facilities that have been certified by the Substance Abuse and Mental Health Services Administration of the United States Department of Health and Human Services and/or by the College of American Pathologists Forensic Urine Drug Testing Program.

19

(Compl. Doc. 1-1 Ex. A, NASCAR Policy § 5.)  In support of their argument, Plaintiffs submit the following affidavit from Harold E. Schueler, Ph.D:

> The NASCAR Substance Abuse Policy does not address any technical requirements or quality standards for testing . . . [but] [b]ased on a fair reading of the NASCAR Drug Policy and the SAMHSA Guidelines, I am of the opinion that Aegis *is expected to* conduct NASCAR testing in accordance with the technical requirements and quality standards established for the SAMHSA certification. Said another way, because Aegis and NASCAR have not identified any other standards to follow, Aegis *should* follow the SAMHSA Guidelines when testing urine for NASCAR.

(Aff. Harold E. Schueler, Ph.D, Doc. 29 ¶ 17) (emphasis added).

 The Policy simply requires that Aegis be SAMHSA certified, which it was.  Plaintiffs cannot point to any case law, or SAMHSA or HHS document, requiring certified labs to follow the Guidelines when servicing private employers.  Plaintiffs' own expert, Mr. Schueler, hedges when he discusses Aegis's obligation to follow the Guidelines: he does not write that Aegis must follow the Guidelines; he states that Aegis "is expected to" and "should."  Mr. Schueler's words undercut any argument that Aegis was "required" to follow the Guidelines.  The allegation that the Policy somehow incorporated the Guidelines is both an unwarranted inference and an unreasonable conclusion, which this Court need not accept.  *See Wahi*, 562 F.3d at 616 n.26.

Third, the NASCAR/Aegis service contract does not require that the Guidelines be followed.   The contact states in relevant part that "NASCAR retains Aegis to conduct certain drug-testing and consultation services pursuant to and in accordance with the attached NASCAR Substance Abuse Policy."  (Def. Doc. 27-7 Ex. 7 at 2.)  As discussed above, the Policy does not incorporate the Guidelines.

*b.  Defendants Followed the NASCAR Substance Abuse Policy*

The Policy requires collection facilities to "label, secure, and transport the specimen(s) . . . in such a manner as to ensure that the specimen(s) are not misplaced, tampered with, or relabeled." (Compl. Doc. 1-1 Ex. A, NASCAR Policy §4.D.)   Mr. Mayfield alleges three ways in which NASCAR violated the Policy: the sample cup had been resting upon an unsterile and cluttered table; the restroom was unsecure and unsterile; and he did not see the technician affix his label to his sample cup.

First, the Policy does not mandate that the testee must select the sample cup from an uncluttered table.  Plaintiffs give no reason why the cluttered nature of the table relates to security or tampering; nor do Plaintiffs identify case law in which clutter relates to the Policy's requirements.

Second, the sterility of the setting could potentially pose a problem, but not on these alleged facts.  First, it is unclear how a lack of sterility violates the Policy.  The Policy does require that a specimen not be tampered with, and alteration is *one* aspect of tampering.  A lack of sterility could alter the specimen, but there is no allegation that the sample cup was unsterile or that the specimen was contaminated.  Further, Plaintiffs do not make any reasoned argument as to how § 4.D of the Policy could be read to include sterility.

Third, Plaintiffs do not describe the way in which the bathroom's alleged lack of security violated the Policy.  Mr. Mayfield does not allege that while he was in the bathroom, some breach of security somehow affected him or his specimen: no one barged into the restroom and tampered with his cup.  All indications are that Aegis complied with its contractual obligation, and kept the bathroom functionally secure.

Finally, the Policy does require that the specimen be properly labeled, but the Policy does not state that the testee must observe the process.  The implication is that all aspects of the

21

Policy—labeling, securing, transporting—had to be carried out under Mr. Mayfield's gaze. This is an unreasonable reading of the Policy.

### III.     Plaintiffs Fail to State a Claim for Negligence

Plaintiffs clearly released Defendants from any negligence claim arising out of the application of the Policy. In addition, Plaintiffs fail to state a claim for negligence because they do not allege any facts showing that Defendants breached their duty of care.

In order to establish a *prima facie* negligence claim, Plaintiffs must show a breach of the duty of care that was owed to them. *Torres v. Sarasota County Pub. Hosp. Bd.*, 961 So. 2d 340, 344 (Fla. App. Ct. 2007); *Cooper v. Lab. Corp. of Am. Holdings, Inc.*, 150 F.3d 376, 379 (4th Cir. 1998). Plaintiffs argue that a duty of care emanated from three sources: (1) Defendants had a duty to use reasonable care when administering a drug test; (2) Defendants had a duty to follow the Policy; and (3) Defendants had a duty to follow the Guidelines, and the SAMHSA and HHS Medical Review Officer Manual for Federal Agency Work Place Drug Testing Programs ("the MRO Manual"). [7]

First, Plaintiffs assert that "the testing facilities employed by NASCAR had a duty to ensure that the collection, handling, and testing of Mayfield's urine specimen was done in a non-negligent manner." (Pl. Resp. Doc. 95 at 11.) This argument seems to amount to more than a claim that Defendants failed to follow their own policy or the federal guidelines. Plaintiffs appear to argue there is a duty of reasonable care when performing a drug test. Plaintiffs cite a string of cases to support their argument, none of which are binding law. *See Stinson v. Physicians Immediate Care, Ltd.*, 269 Ill. App. 3d 659 (1995); *Lewis v. Aluminum Co. of Am.*,

---

[7] The MRO Manual is an out-growth of the Guidelines, which "provides guidance to supplement the medical review officer requirements contained in the Guidelines." (Compl. Doc. 1 ¶ 90.)

588 So.2d 167 (La. Ct. App. 1991); *Elliott v. Laboratory Specialists, Inc.*, 588 So.2d 175 (La. Ct. App. 1991). Moreover, Plaintiffs do not flesh out how Defendants failed to use reasonable care when they administered Mr. Mayfield's drug test. (*See* Compl. Doc. 1 ¶¶ 127-132; Pl. Resp. Doc. 95 at 11-12.) The Court assumes that Plaintiffs takes issue with the following: the allegedly cluttered, unsterile table from which Mr. Mayfield selected a urine sample cup; the allegedly unsecure, unsterile restroom in which Mr. Mayfield urinated into the cup; and the alleged failure of the sample collector to affix a label while Mr. Mayfield watched.

Plaintiffs do not attempt to draw the boundaries of Defendants' duty by discussing the facts of the cases it cited. By way of its own case analysis, this Court concludes that a testing facility does not breach its duty of reasonable care by (1) setting the sample cups on an unsterile, cluttered table, (2) providing an unsecure, unsterile restroom, and (3) by failing to label the sample cups while the testee watches. In *Stinson v. Physicians Immediate Care, Ltd.*, which Plaintiffs cite, the court reversed a granted motion to dismiss when the laboratory allegedly committed the following negligent acts:

> (1) failed to instruct its employees of the danger of specimen contamination; (2) failed to use specimen containers with sealable and tamper-evident lids; (3) failed to seal the specimen containers; (4) failed to obtain the plaintiff's initials or otherwise identify the specimen as belonging to the plaintiff; (5) conducted the drug-screening test so that the results were not accurate and were in error; (6) erroneously tested and reported that the plaintiff had cocaine in his body; and (7) failed to use routinely followed precautionary procedures, including the use of sterile specimen containers, the use of tamper-evident seals, the use of identifying marks on specimen containers, and otherwise conducted the drug-screening test so that the results erroneously diagnosed cocaine in the plaintiff's body.

269 Ill. App. 3d. at 660. The *Lewis v. Aluminum Co. of Am* case fails to describe facts which might help this Court draw the contours of a laboratory's duty: the plaintiff merely rattled off legal conclusions that would not withstand *Twombly*. 588 So.2d at 169. Finally, in *Elliott v.*

23

*Laboratory Specialists, Inc.*, the laboratory's procedures were found to have been scientifically inadequate, but those procedures were not detailed. 588 So.2d at 176.

Here, this Court will not require a laboratory to ensure that every area of its facility is sterile and secure; nor do Plaintiffs' cases impose such a duty. Unlike *Stinson*, Mr. Mayfield did not claim that the cups were not sealed, not sterile, and not tamper-proof. This Court does not know how Mr. Mayfield gauged the sterility of the table and restroom, but under these facts, it is irrelevant. We might presume that a table or restroom becomes unsterile once touched by a hand or once used, but this Court will not mandate that a restroom be cleaned after every use. There is likely a point where sterility becomes an issue, but Mr. Mayfield's facts do not paint such a grim picture. Regarding the security of the restroom, this Court is unsure how the room lacked security. Mr. Mayfield does not allege that his specimen was affected by some breach in restroom security. This Court will not mandate that laboratories have security guards and deadbolts protecting restroom doors. Finally, if Mr. Mayfield was concerned about his label being affixed to his sample cup, he could have affixed the label himself or asked that it be done in front of him. This Court sees no reason to impose this duty upon the laboratory when Mr. Mayfield was also in a position to affix the label or have it affixed.

The second duty alleged by Plaintiffs is grounded in the Policy. This Court doubts that the Policy imposes a duty sounding in negligence; rather, failure to follow the Policy is a contract claim, and the Court is reticent to conflate tort and contract law. Assuming such a duty does exist, none of the alleged facts show that Defendants deviated from the Policy. Defendants allegedly failed to follow the Policy because (1) Mr. Mayfield's drug test was not performed in accordance with the Guidelines and the MRO Manual, and (2) "Defendants' [sic] failed to properly collect and transfer Mr. Mayfield's urine specimen." (Pl. Resp. Doc. 95 at 8.)

24

Contrary to Plaintiffs' allegations, the Policy does not incorporate federal procedures for workplace drug testing. The Policy merely states that "all testing will be done at a facility or facilities . . . that have been certified by the Substance Abuse and Mental Health Services Administration . . . and/or by the College of American Pathologists Forensic Urine Drug Test Program." (Compl. Doc. 1-1 Ex. 1, NASCAR Policy § 5.) Furthermore, a SAMHSA certified facility is not required to follow federal guidelines when servicing private employers. *Cooper*, 150 F.3d at 379.

Regarding Defendants' alleged transport and collection failures, the Policy requires the facility to "label, secure, and transport the specimen(s) . . . in such a manner as to ensure that the specimen(s) are not misplaced, tampered with, or relabeled." (Compl. Doc 1-1 Ex. 1, NASCAR Policy §4.D.) Mr. Mayfield alleges that he did not see NASCAR's agent affix his label to his specimen. The policy does not require that Mr. Mayfield observe the label being affixed. Mr. Mayfield does not allege that the label was never affixed. He does not allege sufficient facts to show that the Policy was violated.

The third alleged duty is that Defendants were required to follow the Guidelines and the MRO Manual. The Court reiterates its observation that this is actually a breach of contract claim. Even as a negligence claim, as discussed above, Plaintiffs cannot establish that Defendants have a duty under the Guidelines and the MRO Manual. *See Cooper*, 150 F.3d at 379. Plaintiffs have not identified language within the Guidelines requiring that they adhere when private employees are tested.

In short, Defendants did not breach their duty of care, and Plaintiffs negligence claim fails.

**CONCLUSION**

25

Plaintiffs agreed to release Defendants from all claims arising under a negligence theory or otherwise; Plaintiffs thereby waived their right to pursue their claims for defamation, unfair and deceptive trade practices, breach of contract, and negligence.  Plaintiffs also failed to allege facts to support each of their claims, including the PDPA action.  Plaintiffs' claims are hereby dismissed.  **SO ORDERED.**

Signed: May 18, 2010

Graham C. Mullen
United States District Judge